[No. A101223. First Dist., Div. Three. Sept. 7, 2004.]

THE PEOPLE, Plaintiff and Respondent, v.
JORGE ANTONIO PANTOJA, Defendant and Appellant.

---

## COUNSEL

J. Frank McCabe, under appointment by the Court of Appeal, for Defendant and Appellant.

Bill Lockyer, Attorney General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Stan Helfman and Sharon G. Birenbaum, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**POLLAK, J.**—Defendant Jorge Antonio Pantoja appeals from his conviction on one count of first degree murder and one count of child endangerment after he killed his girlfriend, Maria Montero, in the presence of their daughter. In proving that defendant committed premeditated murder, the prosecution

relied in large part on a declaration by Montero included in an application for a restraining order that was filed several days before she was killed. In the declaration, Montero stated that defendant had threatened to kill her. Defendant contends that the declaration was not admissible under Evidence Code section 1370 and that its receipt in evidence violated his Sixth Amendment right of confrontation under the United States Constitution. We agree that the contents of the declaration were not admissible under section 1370, and we therefore do not reach the constitutional question. Because the erroneous admission of this evidence likely influenced defendant's conviction of premeditated murder, rather than a lesser degree of homicide, we reverse his conviction.

BACKGROUND

There was substantial evidence at trial of the following facts.

On February 23, 1999, defendant went to the emergency room in Eureka with a superficial knife wound to his abdomen, which he had inflicted on himself. He told the doctor that he had stabbed himself because he was jealous of his wife and wanted to hurt himself and possibly her, as well. On February 26, 1999, Officers Martinez and Mengel of the Eureka Police Department went to Montero's apartment to follow up on a report of spousal abuse. Montero told Martinez that she and defendant lived together and had a child, Kenia, together. She told Martinez that she was afraid that defendant would take Kenia, and she showed him a faint bruise on her right calf where she said defendant had kicked her. Martinez obtained an emergency protective order ordering defendant to stay away from Montero.

In November or December of 2000, Montero contacted Officer Reyna-Sanchez of the Eureka Police Department because defendant was at her apartment and she felt uncomfortable returning to the apartment with him there. They met at a restaurant and he escorted Montero home. When they arrived at the apartment, Reyna-Sanchez told defendant that Montero did not want him there. Defendant expressed his concern that if he and Montero separated, he would lose contact with his daughter. Defendant then left.

On April 23, 2001, Officer Honeycutt of the Eureka Police Department went to Montero's apartment with Reyna-Sanchez. Montero told the officers that defendant had come to the apartment earlier to return Kenia, who had spent the day with him. He left, but returned and demanded to see Kenia again. She refused, and defendant began arguing with her. Montero closed the door, but defendant continued arguing with her through the window. Montero told the officers that defendant had pulled a knife from his pocket. He then drove past the apartment six times and called several times. After gathering

this information, Honeycutt and Reyna-Sanchez went to a different address where they found defendant. Defendant admitted that he had been in an argument with Montero over their daughter. He denied having a knife, and when the officers searched him they did not find one. Reyna-Sanchez suggested to defendant that if his relationship with Montero was ending, "he should focus his attention on his future with his daughter and visitations and court proceedings to ensure those visitations."

On August 26, 2001, Reyna-Sanchez responded to a 911 hang-up call that came from Montero's apartment. When he arrived, defendant was intoxicated and he was arguing with Montero about possession of a car. Reyna-Sanchez spoke to Montero about the status of the relationship, and Montero indicated that she planned to obtain a restraining order against defendant. Reyna-Sanchez explained to defendant that if she obtained such an order, "it would reflect negatively on him. And it may impact whether or not he was granted custody of his child or visitations." According to Reyna-Sanchez, defendant "seemed to understand . . . that, bottom line, if he wanted to continue seeing his daughter, that he needed to abide by my advice and any legal paperwork that was granted." Defendant was upset, but not violent. Reyna-Sanchez took defendant back to his apartment and told him that unless defendant did something to jeopardize his rights, because he was the biological father he would be able to see his daughter even if Montero was involved with someone else.

On August 30, 2001, a neighbor of Montero's, Star Bakas, was studying in her apartment when she heard a woman say "No, no, no" and a woman and a child screaming. She ran to Montero's apartment. The screams continued for the few seconds it took her to cover the short distance between the two apartments, but by the time she reached the door of Montero's apartment, the screams had stopped. Bakas called out, "I called 911. They're on their way," although she had not done so. She repeated this two or three times, but no one responded. When she knocked on the door, it swung open. She saw Montero sitting on the floor against the couch, not moving, covered with blood. Kenia was also there, standing quietly beside Montero. She then saw defendant sitting on the floor, facing the door, with a knife to his throat. She could see a small trickle of blood coming from his throat at the point of the knife. Bakas and defendant looked at each other, and Bakas "hollered out, 'No, don't do it.' " Defendant did not respond.

Bakas ran next door and beat on the door of a neighboring apartment, while she yelled for someone to call 911. Receiving no response, she returned to Montero's apartment, where she saw that defendant was "laying on his back, arms to his side, the knife in his hand." He sat up, and she saw that there was still a small trickle of blood on his neck. When Bakas left the

apartment, defendant was holding the knife in both hands and pointing it at his abdomen. He was not bleeding from his abdomen. Another neighbor called the police. When Officers Tim Jones and Mike Johnson of the Eureka police department arrived at Montero's apartment, they found defendant lying on his back with a large knife in his hand. The officers told defendant to drop the knife, and he did.

Defendant testified at trial as follows. He met Montero in 1996 and they lived together off and on from 1996 through 2001. They argued about defendant's drinking, about money, and about the fact that defendant was jealous of her. Defendant helped to care for Kenia. When he was separated from Kenia he felt very sad. In mid-May of 2001, defendant moved back in with Montero, but they continued to argue and he moved out again. Montero told defendant that she was seeing another man, which defendant believed would interfere with his relationship with Kenia. When Montero refused to let him see Kenia, it made him sad. Defendant acknowledged that he tried to see Montero on August 26, when he was drunk, and that the police escorted him home that day. He returned to see Montero and talk about Kenia on August 30, 2001. He had heard that Montero was attempting to get a restraining order, and he was sad that he might have to go to court to be able to see Kenia. Kenia was playing outside in the car when he went into the house to talk with Montero. Montero told defendant that she would no longer let him see Kenia. Defendant wanted to hurt himself when Montero told him this. He told Montero, "If you won't let me see my child, I don't even want to live anymore. I'm going to kill myself." Montero replied, "Go ahead. . . . If you have balls to do it, go ahead and do it." He retrieved from under the bed a knife that he had purchased and told Montero that he was going to kill himself. He put it against his chest, started to cry, then placed the knife on the television, and went into the bathroom. Defendant said that he felt very depressed when he came out of the bathroom, and did not want to live. According to defendant, Montero said, "Well, what's happening? You said you were going to kill yourself." He placed the knife against his chest again, and Montero pushed it into him twice. Then, defendant testified, he "just went at her." He testified that, "I don't know what happened to me. I went blind. I didn't even know what I was doing. [¶] . . . [¶] I did not know what had happened. I didn't know even anything about my person." He stated that he did not know where Kenia was at the time. He told the jury that he did not remember stabbing Montero 30 times, stabbing her in the back, chest, or stomach.

The forensic pathologist who examined Montero's body testified that Montero sustained a number of stab wounds, some of which entered her chest cavity and injured internal organs. The deepest stab wound penetrated her right lung. Other wounds penetrated her heart, left lung, stomach, liver, and rectum. There were many other wounds that did not damage her organs. From

the nature of the stab wounds, the pathologist concluded that a struggle occurred, "because the victim is trying to keep from having this knife enter into vital organs. So sometimes she would be successful in that and these wounds would be superficial, and sometimes she wasn't." Several of the wounds observed by the pathologist in Montero's left arm were exit wounds, because the knife had passed through her arm. The pathologist also observed a number of defensive wounds on Montero's hands. At least five potentially fatal wounds were inflicted. There was a single stab wound in Montero's back, which hit her spine. During the autopsy, the coroner recovered the tip of the knife from Montero's left humerus.

An indictment was filed, charging defendant with first degree murder (Pen. Code, § 187, subd. (a)), and alleging that he used a knife in the commission of the murder. A first amended complaint alleged in an additional count that defendant had endangered Kenia in violation of Penal Code section 273a, subdivision (a).

During the trial, the district attorney moved to admit evidence of prior incidents of domestic violence, including the emergency protective order that Montero obtained in 1999 and evidence of the warning by the police to defendant in April 2001. The prosecutor also offered an application for a temporary restraining order against defendant that Montero filed on August 27, 2001, three days before the killing. The application for the restraining order included a declaration by Montero. The prosecutor argued that Montero's declaration was admissible as an exception to the hearsay rule under Evidence Code section 1370 (threats of physical injury). Defendant opposed the introduction of this evidence on the ground that the extrajudicial statements did not satisfy the criteria for admissibility under section 1370 or the confrontation clause of the Sixth Amendment of the United States Constitution because they lacked sufficient indicia of trustworthiness. The trial court granted the district attorney's motion and admitted the evidence, observing, "I believe it's essentially stipulated that Ms. Montero had some assistance in putting forth the written declaration, given my understanding that she was not fluent in English. The Court, nonetheless, pursuant to Evidence Code section 1370 and the *Correa* [*v. Superior Court* (2002) 27 Cal.4th 444 [117 Cal.Rptr.2d 27, 40 P.3d 739]] decision, I do find that this statement is admissible for purposes of these trial proceedings."

The prosecutor began his closing argument by telling the jury, "I want to begin by discussing a piece of evidence that was admitted but you haven't— you'll have with you in the jury room, but you haven't heard it in substance yet. This is the Application and Declaration for the Restraining Order that Maria applied for about three days before she was killed." He proceeded to

read Montero's declaration to the jury.[1] "On August 28th,-2000,-Mr. Jorge Pantoja puch me and kick me in my leg. A few day latter he start to fith with me because I was going to go to my brother house. We started to fith. Very jealiouse, teling me all can of thing. That day I went to my son house and when I returned found that he had left with some of my thing. So he came back in Abril 2001 he whanted to get back with me he would call and whanted to se her dauther. He told me that he had already had [illegible]. So one day he came to my house and by my window he was teling me that if I did not go back with him he would kill me. There were two person in my house when that happen. I called the police & they told me that I need to go get a restraining oder to keep him away. So I whent back with him May 21, 2001, to tray again but he keep drunking alot all the time & abuseve with me."

The prosecutor then argued that "the whole defense in this case rests on one premise. . . . The defense is Maria stabbed him first. . . . Remember, though, this is the same Maria who three days before went to tell the Judge, 'This guy's talking about killing me.'" In his rebuttal, the prosecutor again emphasized the implications of Montero's declaration: "Take Maria's application for a restraining order. See that she wrote days before she was killed that he had threatened to kill her in April." He also argued, after describing the fatal wounds that were inflicted on Montero, "Does that seem like a reasonable man, or does that seem like someone intent on killing? It's murder. The question is, is it murder of the second degree or a murder of the first degree. Well, the difference is did he think about it. [¶] Did he think about it? Did he weigh the pros and cons, and then, when it came to it, he makes up his mind to kill her? He clearly made up his mind to kill her. The wounds prove that. He intended to kill her. Did he think about it? *Well, Maria said he brought it up quite some time before.*" (Italics added.)

The jury found defendant guilty on both counts and found the allegation that he had used a knife to be true. Defendant was sentenced to prison for 25 years to life on the first count, with consecutive terms of one year for use of the knife and six years on the second count. He timely appealed.

DISCUSSION

*The Trial Court Erred in Admitting the Declaration*

Defendant first argues that the trial court violated his Sixth Amendment right to confront the witnesses against him by admitting the application for

---

[1] The text of the handwritten declaration, with its many spelling and grammatical errors, is reproduced as it appears in the record.

the restraining order that Montero filed days before she was killed. In the trial court and in his opening brief to this court, defendant focused his argument on whether there were sufficient indicia of reliability to permit Montero's hearsay statement to be received under Evidence Code section 1370 and the Sixth Amendment of the United States Constitution standard prescribed in *Ohio v. Roberts* (1980) 448 U.S. 56 [65 L.Ed.2d 597, 100 S.Ct. 2531] (*Roberts*). In *Roberts* the United States Supreme Court held that admission of a witness's out-of-court statement does not violate the confrontation clause if the witness is unavailable and the statement falls within a "firmly rooted hearsay exception" or bears "particularized guarantees of trustworthiness." (*Id.* at p. 66; see also *Idaho v. Wright* (1990) 497 U.S. 805 [111 L.Ed.2d 638, 110 S.Ct. 3139].)

After the briefing in this court had been completed, the United States Supreme Court issued its decision in *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*). At the court's request, the parties submitted supplemental briefs concerning the application to this case of what may fairly be characterized as a revolutionary decision in the law of evidence. In *Crawford*, the Supreme Court, overruling *Roberts, supra,* 448 U.S. 56, held that testimonial statements of an absent witness may be admitted "only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." (*Crawford, supra,* 541 U.S. at p. 59 [124 S.Ct. at p. 1369].) As explained by Justice Scalia, "Admitting statements deemed reliable by a judge is fundamentally at odds with the right of confrontation. To be sure, the [Confrontation] Clause's ultimate goal is to ensure reliability of evidence, but it is a procedural rather than a substantive guarantee. It commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination." (*Id.* at p. 61 [124 S.Ct. at p. 1370].) "That inculpating statements are given in a testimonial setting is not an antidote to the confrontation problem, but rather the trigger that makes the Clause's demands most urgent. It is not enough to point out that most of the usual safeguards of the adversary process attend the statement, when the single safeguard missing is the one the *Confrontation Clause* demands." (*Id.* at p. 65 [124 S.Ct. at p. 1372].)

Montero's declaration in support of her application for a restraining order falls within the definition of a testimonial statement subject to the *Crawford* analysis. Testimonial statements include " '*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially.' " (*Crawford, supra,* 541 U.S. at p. 51 [124 S.Ct. at p. 1364].) There is no question that defendant did not have the

opportunity to cross-examine Montero with respect to her declaration. Nonetheless, the Attorney General contends that the new rule announced in *Crawford* does not apply because Montero's unavailability was caused by defendant's wrongdoing.[2] We need not decide that question here.

The constitutional question is not the proper starting point of analysis. Before determining whether the Sixth Amendment prohibits introduction of the hearsay contained in Montero's declaration, we must first determine whether the declaration is admissible under Evidence Code section 1370. If the statement is not admissible under the statute, we need not and should not decide whether the confrontation clause would preclude its admission. "When statutory grounds dispose of an issue, constitutional questions should be avoided because of the 'concept of judicial self-restraint, succinctly stated in the rule that "we do not reach constitutional questions unless absolutely required to do so to dispose of the matter before us." [Citations.] As the United States Supreme Court reiterated, "A fundamental and longstanding principle of judicial restraint requires that courts avoid reaching constitutional questions in advance of the necessity of deciding them." ' " (*People v. Barasa* (2002) 103 Cal.App.4th 287, 292 [126 Cal.Rptr.2d 628].)[3]

---

[2] The Attorney General argues that *Crawford* does not apply in this instance because the Supreme Court recognized an exception for the "rule of forfeiture by wrongdoing." (*Crawford, supra,* 541 U.S. at p. 62 [124 S.Ct. at p. 1370]; see Fed. Rules Evid., rule 804(a), (b)(6) (28 U.S.C.); *U.S. v. Thompson* (7th Cir. 2002) 286 F.3d 950, 961–962; *U.S. v. Dhinsa* (2nd Cir. 2001) 243 F.3d 635, 653; *U.S. v. Price* (10th Cir. 2001) 265 F.3d 1097, 1103; *U.S. v. White* (D.C. Cir. 1997) 325 U.S. App. D.C. 282, 116 F.3d 903, 911 ["where a defendant has silenced a witness through the use of threats, violence or murder, admission of the victim's prior statements at least partially offsets the perpetrator's rewards for his misconduct"].) The rule of forfeiture arguably is inapplicable. Under the cases interpreting the provision in the Federal Rules of Evidence, a defendant loses the right to object only if the defendant "(1) causes a potential witness's unavailability (2) by a wrongful act (3) undertaken with the intention of preventing the potential witness from testifying at a future trial." (*U.S. v. Houlihan* (1996) 92 F.3d 1271, 1280.) There is no evidence that defendant killed Montero for the purpose of preventing her from testifying. Nonetheless, there is authority suggesting that, despite the potential for bootstrapping, the forfeiture rule applies when the predicate wrongdoing is the very crime for which the defendant is being tried. (*U.S. v. Emery* (8th Cir. 1999) 186 F.3d 921; *State v. Meeks* (2004) 277 Kan. 609 [88 P.3d 789]; *People v. Moore* (July 29, 2004, 01CA1760) Colo.App. [2004 Colo.App. LEXIS 1354]; Friedman, *Confrontation and the Definition of Chutzpa* (1997) 31 Israel L.Rev. 506.) We express no opinion as to how the concept of forfeiture by wrongdoing applies in post-*Crawford* cases.

[3] In the trial court, defendant asserted that Evidence Code section 1370 is itself unconstitutional, but defendant has abandoned this contention on appeal. We note, however, that section 1370 differs from Evidence Code section 1380, which the Sixth Appellate District recently found to be unconstitutional on its face under *Crawford*. (*People v. Pirwani* (2004) 119 Cal.App.4th 770 [14 Cal.Rptr.3d 673].) Section 1380 applies only if the out-of-court statement is "memorialized in a videotape recording made by a law enforcement official" and, therefore, applies exclusively to testimonial statements (*id.* at subd. (a)(3)), while section 1370 applies if the statement "was made in writing, was electronically recorded, or made to a physician, nurse, paramedic, or to a law enforcement official" (*id.* at subd. (a)(5)).

Evidence Code section 1370 provides: "(a) Evidence of a statement by a declarant is not made inadmissible by the hearsay rule if all of the following conditions are met: [¶] (1) The statement purports to narrate, describe, or explain the infliction or threat of physical injury upon the declarant. [¶] (2) The declarant is unavailable as a witness pursuant to Section 240. [¶] (3) The statement was made at or near the time of the infliction or threat of physical injury. Evidence of statements made more than five years before the filing of the current action or proceeding shall be inadmissible under this section. [¶] (4) The statement was made under circumstances that would indicate its trustworthiness. [¶] (5) The statement was made in writing, was electronically recorded, or made to a physician, nurse, paramedic, or to a law enforcement official."

Montero's declaration unquestionably satisfies the first, second and fifth statutory criteria. As to the third criterion, defendant argues that the declaration was not "made at or near the time of the . . . threat of physical injury." The declaration, which was undated but filed on August 27, 2001, narrates not only events that occurred in the preceding months, but events from a year earlier. The threat to kill Montero was made "one day [when] he came to my house." Although the context of the declaration suggests that this occurred in April or May 2001—three or four months before the declaration was filed—even this is not clear. It is unnecessary to decide whether Montero's declaration was made sufficiently "near the time of the . . . threat of physical injury" to satisfy section 1370, subdivision (a)(3), although the apparent lapse of at least 90 days bears upon the trustworthiness of the statement. (See *People v. Kons* (2003) 108 Cal.App.4th 514, 522, 524 [133 Cal.Rptr.2d 520] [statement "made over a day and possibly two days after the shooting," giving declarant "time to collect himself and come up with a story," was inadmissible under section 1370 because unreliable].)[4]

 Whether or not the events recited in the declaration were too remote, the declaration fails entirely to meet the fourth criterion's requirement of trustworthiness for other more fundamental reasons. Initially, there is a complete absence of foundational information necessary to determine the reliability of the statement. The showing that a hearsay statement is sufficiently reliable to be received in evidence must be based not on the content of the statement itself, but on the "circumstances that surround the making of the

---

[4] Certainly Montero's statement was not sufficiently contemporaneous with the event to satisfy the "firmly rooted" hearsay exception for spontaneous declarations, where spontaneity is considered to provide the assurance of reliability. (Evid. Code, § 1240; *People v. Gutierrez* (2000) 78 Cal.App.4th 170, 178–179, fns. 8 & 9 [92 Cal.Rptr.2d 626]; *People v. Kons, supra,* 108 Cal.App.4th at pp. 523–524; *People v. Hernandez, supra,* 71 Cal.App.4th at p. 424.) However, as the court observed in *People v. Kons, supra,* 108 Cal.App.4th at page 523, the at-or-near-the-time requirement of Evidence Code section 1370, subdivision (a)(3), though close, cannot be equated with the spontaneity requirement of Evidence Code section 1240.

statement and that render the declarant particularly worthy of belief." (*Idaho v. Wright, supra,* 497 U.S. at p. 820; *People v. Kons, supra,* 108 Cal.App.4th at pp. 521, 524–525; cf. *People v. Hernandez* (1999) 71 Cal.App.4th 417, 425 [83 Cal.Rptr.2d 747].) The prosecutor laid no foundation for admission of Montero's declaration, but simply asked the trial court to take judicial notice of the document. The court was authorized to judicially notice the fact that the declaration had been filed in superior court proceedings (Evid. Code, § 452, subd. (d)), but this authority did not extend to the truth of the matters contained in the declaration, for which the statement that defendant had threatened to kill Montero was offered. (*Lockley v. Law Office of Cantrell, Green, Pekich, Cruz & McCort* (2001) 91 Cal.App.4th 875, 882 [110 Cal.Rptr.2d 877].)

In addition to the absence of information concerning the time, place and circumstances under which the declaration was prepared, it is unclear who actually wrote the declaration. As the trial judge observed, Montero spoke almost no English and therefore probably did not write the declaration herself. If Montero's statements were translated and transcribed by someone else, there is no indication in the record of who that was or of that person's proficiency as a translator. Nor do we know whether the statement was read to Montero in either language or whether she gave it any form of meaningful review. In admitting the declaration, the trial court cited *Correa v. Superior Court, supra,* 27 Cal.4th at page 455, which holds that translation of a statement "does not add a layer of hearsay when a translator acts as a 'language conduit' so as to cause the statement to be fairly attributable to the declarant." However, in *Correa* the California Supreme Court held that the trial court "should consider 'a number of factors which may be relevant in determining whether the interpreter's statements should be attributed to the [declarant] . . . , such as which party supplied the interpreter, whether the interpreter had any motive to mislead or distort, the interpreter's qualifications and language skill, and whether actions taken subsequent to the conversation were consistent with the statements as translated.' " (*Id.* at p. 458.) Here, the trial court considered none of these factors, and could not have done so because of the absence of the foundational facts necessary to make such an evaluation. The spelling and grammatical errors in the declaration itself certainly suggest that whoever wrote it was not particularly skilled as an English speaker. Thus, there is no assurance that the critical phrase emphasized by the prosecution, that defendant told Montero he would kill her if she did not "go back" with him, was accurately translated and transcribed. Indeed, there is no assurance that these were Montero's words, rather than something included at the suggestion of another person present when the declaration was written.

Moreover, Evidence Code section 1370 provides that in evaluating the trustworthiness of a statement under paragraph (4) of subdivision (a), the

court is to consider "(1) Whether the statement was made in contemplation of pending or anticipated litigation in which the declarant was interested. [¶] (2) Whether the declarant has a bias or motive for fabricating the statement, and the extent of any bias or motive. [¶] (3) Whether the statement is corroborated by evidence other than statements that are admissible only pursuant to this section." (Evid. Code, § 1370, subd. (b).) Each of these statutorily prescribed considerations points in the direction of nonadmissibility in this case. The declaration was prepared "in contemplation of . . . anticipated litigation" in which Montero was interested; it was prepared for the purpose of obtaining a temporary restraining order against defendant. The application for the restraining order requests other forms of relief as well. Montero asked for custody of Kenia and child support, and that the court award her $250 per month for baby sitting. Thus, Montero had an interest in the outcome of the restraining order proceedings, potential bias, and a motive to stretch the truth. And, while there is some corroboration of past acts of domestic violence, the statement that defendant threatened to kill Montero is uncorroborated in the record. To the contrary, on cross-examination, Officer Reyna-Sanchez testified that when he spoke with Montero on April 23, 2001, the date on which the declaration appears to indicate the alleged threat was made, she did not complain that defendant "had threatened her in any way."

Thus, there was no showing that Montero's statement was made under circumstances indicating its trustworthiness, and the declaration was admitted erroneously under Evidence Code section 1370. We therefore must reverse defendant's conviction if it is "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." (*People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) The Attorney General argues that the "evidence of [defendant's] guilt was overwhelming, based on eyewitness testimony and physical evidence." We disagree. While there was no dispute that defendant was the person who killed Montero, the defense contended that he acted in self-defense or upon a sudden quarrel, and not with the premeditation necessary to establish first degree murder. The neighbor Bakas's testimony that she heard screams was hardly dispositive of the critical issue that was before the jury. The Attorney General points out that Bakas testified that she heard the screams almost immediately after she saw Montero and Kenia go into the apartment, which he asserts is inconsistent with defendant's testimony that he had a discussion with Montero about visitation, got the knife, put it down, went into the bathroom and returned before the killing occurred. However, Bakas admitted that she had drunk a beer and smoked a "joint" the morning of the incident and testified that it was "two or three minutes" before she heard Montero's screams. Moreover, Bakas did not tell the police on the day of the killing that she had seen Montero and Kenia go into the apartment before the attack.

Nor does the sheer quantity of the wounds or the existence of defensive wounds on Montero's hands prove that the assault was not committed upon sudden provocation, as the Attorney General argues. (See *People v. Anderson* (1968) 70 Cal.2d 15, 24–25 [73 Cal.Rptr. 550, 447 P.2d 942] ["[I]t is well established that the brutality of a killing cannot in itself support a finding that the killer acted with premeditation and deliberation. 'If the evidence showed no more than the infliction of multiple acts of violence on the victim, it would not be sufficient to show that the killing was the result of careful thought and weighing of considerations.' "]; *People v. Alcala* (1984) 36 Cal.3d 604, 626 [205 Cal.Rptr. 775, 685 P.2d 1126] ["The fact that a slaying was unusually brutal, or involved multiple wounds, cannot alone support a determination of premeditation. Absent other evidence, a brutal manner of killing is as consistent with a sudden, random 'explosion' of violence as with calculated murder."].)

The Attorney General argues that the single wound in Montero's back indicates conclusively that defendant first stabbed her in the back and she turned to defend herself. The prosecutor elicited testimony from the pathologist that Montero could not have been stabbed in her back in the position in which she was found, lying on the floor. The prosecutor also asked the pathologist, "To inflict the wound [to the back], the victim will [have] to have her back to her assailant. Am I correct?" The pathologist responded only, "She would have to have her back to the knife tip." This testimony does not establish that Montero was necessarily stabbed first. To the contrary, there was evidence from defendant's expert that the wounds in defendant's chest were probably made before the tip of the knife was broken off—in other words, before defendant stabbed Montero.[5]

However skeptical one might be of defendant's version of events, it was not, as the Attorney General argues, "so fantastic and incredible that it was itself an indication of consciousness of guilt[]." Nor is the fact that defendant admitted to being upset that Montero was seeking a restraining order sufficient to prove beyond a reasonable doubt that he premeditated Montero's killing. In arguing that the killing was premeditated, the prosecutor relied heavily on the contents, rather than the mere existence, of the application for the restraining order. Montero's declaration was the first thing that the prosecutor discussed in his closing argument, and the last piece of evidence he mentioned in his rebuttal. Montero's statement in the declaration that defendant had said he would kill her may well have weighed heavily in the minds of the jurors in determining whether defendant's act was premeditated. "There is no reason why we should treat this evidence as any less 'crucial'

---

[5] In his petition for rehearing, the Attorney General emphasizes other evidence that he argues tended to show premeditation. However none of that evidence is sufficient to render the erroneous admission of the declaration harmless.

than the prosecutor—and so presumably the jury—treated it." (*People v. Cruz* (1964) 61 Cal.2d 861, 868 [40 Cal.Rptr. 841, 395 P.2d 889].) While there unquestionably was evidence that supported the prosecution's theory of premeditated murder, it is reasonably probable that the jury would have made a finding more favorable to the defendant absent admission of the declaration contained in the application for the restraining order.

We reject as well the Attorney General's additional argument that admission of the application for the restraining order was harmless because it was admissible for a nonhearsay purpose. The Attorney General argues that defendant put Montero's mental state at issue by arguing that she was the initial aggressor and therefore that the contents of the application were admissible to show that she was afraid of him and would not have started a fight when he was armed with a knife. However, Montero's declaration was not offered or used for such a limited purpose. The prosecutor made no such argument to the jury in referencing Montero's declaration. Rather, he argued that Montero's statements proved that defendant went to Montero's house intending to kill her. Had the evidence been received for a limited purpose, the prosecutor would not have been able to make the same closing argument to the jury.

*Other Issues*

Because we reverse defendant's conviction, we need not reach defendant's argument that the trial court erred by refusing to dismiss a particular member of the jury. Neither do we reach defendant's argument that the trial court erred in failing to give sua sponte a jury instruction on provocation or that he received ineffective assistance of counsel because his attorney did not request such an instruction. Finally, we need not consider defendant's cumulative error argument.

*Sentencing*

Defendant argues that his sentence on the count of child endangerment should be stayed pursuant to Penal Code section 654 because "both convictions and sentences result from [defendant's] single act of causing the death of Maria Montero." Because this issue may arise upon a retrial, we consider the issue, but reject defendant's contention. "Section 654 is not '. . . applicable where . . . one act has two results each of which is an act of

violence against the person of a separate individual.' " (*Neal v. State of California* (1960) 55 Cal.2d 11, 20–21 [9 Cal.Rptr. 607, 357 P.2d 839].) Defendant's argument that the crime of child endangerment was not a crime of violence because defendant did not direct his acts at Kenia, and therefore is not consecutively punishable, is not well taken. "The purpose of the protection against multiple punishment is to insure that the defendant's punishment will be commensurate with his criminal liability. A defendant who commits an act of violence with the intent to harm more than one person *or by a means likely to cause harm to several persons* is more culpable than a defendant who harms only one person. For example, a defendant who chooses a means of murder that places a planeload of passengers in danger, or results in injury to many persons, is properly subject to greater punishment than a defendant who chooses a means that harms only a single person. This distinction between an act of violence against the person that violates more than one statute and such an act that harms more than one person is well settled." (*Id.* at p. 20, italics added.) There is no requirement that the prosecution show that the defendant intended harm to each victim by his wrongdoing, and no doubt that defendant's acts harmed Kenia. Therefore he may be punished separately for that separate crime.

### DISPOSITION

The matter is reversed and remanded for further proceedings consistent with this opinion.

McGuiness, P. J., and Corrigan, J., concurred.

A petition for a rehearing was denied October 6, 2004, and the opinion was modified to read as printed above.