[No. D050385. Fourth Dist., Div. One. Sept. 12, 2007.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL PEDRO QUITIQUIT, Defendant and Appellant.

## Counsel

Catherine White, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gary W. Schons, Assistant Attorney General, Ronald A. Jakob and David Delgado-Rucci, Deputy Attorneys General, for Plaintiff and Respondent.

## Opinion

**McINTYRE, J.**—The critical issue on this appeal is whether the trial court erred in admitting evidence of a declarant's statements to her doctor and a police officer that defendant had caused her neck injury seven weeks earlier, pursuant to the "physical injury" exception to the hearsay rule for statements made "at or near" the time of the injury. (Evid. Code, § 1370, subd. (a)(3).) (All further statutory references are to the Evidence Code except as otherwise noted.) We conclude that the statements were not made at or near the time of the injury and that the statements to the officer were not made under circumstances indicating their trustworthiness and thus none of the statements qualified for admission pursuant to section 1370. We reverse the judgment on this basis without reaching (1) the alternative issue of whether the admission of the declarant's statements to the police officer also violated defendant's confrontation rights as described in *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177, 124 S.Ct. 1354] (*Crawford*), (2) the related issue of whether defendant is precluded from asserting his confrontation rights pursuant to the forfeiture by wrongdoing doctrine (see *People v. Giles* (2007) 40 Cal.4th 833, 840–854 [55 Cal.Rptr.3d 133, 152 P.3d 433]), and (3) defendant's contention that the court's imposition of an upper term sentence violated his constitutional rights to a jury trial under *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856].

## FACTUAL SUMMARY

In early 2002, defendant, Michael Pedro Quitiquit, and his wife of 15 years, Martina Villanueva, were separated, although Quitiquit periodically stayed with Villanueva in her mobilehome in Indio. (All further designated dates are in 2002 except as otherwise noted.) Villanueva's son, Anthony Jara (then age 31), and three of the couple's children, Martin (age 22), Lorraine Julie (age 17; referred to by the parties, and herein, as Julie), and Tina (age 16), lived with Villanueva at that time.

Late in the evening of March 6, while Villanueva and Quitiquit were in her bedroom, they got into an argument. A week later, Villanueva went to the doctor, complaining of various symptoms, including numbness in her right cheek, ear pain, and weakness and numbness on the left side of her body, which she said she had been experiencing for one to two weeks; she was ultimately diagnosed with, and prescribed antibiotics for, an ear infection.

Villanueva experienced increasing numbness, as well as additional symptoms, over the next week and again consulted with her doctor. Villanueva told the attending nurse practitioner that she had "no known injury to [her] neck," although an X-ray of her cervical (upper) spine taken the next day revealed that she had a degenerative condition in the back of her neck that could have been caused by "prior injuries . . . or arthritis."

Because of increasing physical difficulties, Villanueva stopped working as a shoe department manager at the end of March and went back to see her doctor again in early April. During a visit on April 6, Villanueva indicated that she had been experiencing physical problems for three to four weeks. An MRI (magnetic resonance imaging) of Villanueva's head and cervical spine showed that she had degenerative disk disease, a small disk herniation that could have been caused by an injury and swelling in her upper spine.

On April 14, after an argument between Quitiquit and Julie relating to Villanueva's deteriorating condition, Julie and two of her sisters took Villanueva to the hospital. Villanueva was treated in the emergency room and then admitted to the hospital by internist Richard Kyaw. An MRI and X-ray of her spine showed "extensive signal alteration" of her cervical and thoracic spine, possibly as a result of traumatic injury, although she reported that she had no "prior history of . . . trauma." She was prescribed high-dose steroids to reduce the inflammation of her spinal cord.

On April 24, after having been at the hospital for approximately nine days, Villanueva reported for the first time that Quitiquit had twisted her neck. Hospital staff promptly notified the police of Villanueva's accusations and the next day, Indio Police Officer Jeremy Hellawell telephoned Villanueva to investigate her statements. During the call, Villanueva told him that during an argument on March 6, her husband approached her as she was lying on her bed, grabbed her head with both hands (one under her chin and the other behind her head) and pulled her off of the bed while twisting her neck.

Based on the nature of Villanueva's statements, Indio Police Officer Hellawell went with a second officer to the hospital to interview Villanueva in person. Although Villanueva was sleepy and "a little bit out of it," she reiterated what she had told Officer Hallowell on the phone and described the symptoms she had experienced since the incident. Villanueva made clear, however, that she was not interested in pressing charges against Quitiquit for the abuse.

The officers also interviewed Julie, who was at the hospital visiting Villanueva. She appeared to be very angry after hearing Villanueva's statements and told Officer Hellawell that although she had not seen anything on the night of the incident, she had heard her mom yell out her father's name during the argument. After completing the interview with Julie, Officer Hellawell issued an all-points report calling for Quitiquit's arrest.

Villanueva was discharged from the hospital on April 25 (the same day that Officer Hellawell interviewed her) despite the fact that there had been no improvement in her condition. The hospital doctors were unable to reach a consensus as to the cause of Villanueva's problems and no official specific diagnosis was made, although the general diagnosis was that she had symptoms from an acute cervical spine injury or condition, accompanied by an infection.

Villanueva's physical problems continued to worsen and by July 2, she had permanent partial paralysis of her arms and legs. Although Villanueva had some range of movement, she could not walk on her own; in addition, she had lost the ability to control her bladder and bowels and was suffering from neuropathic pain, all as a result of an incomplete spinal cord injury in her cervical (upper) spine. Villanueva underwent neck surgery in September to permit a biopsy of her spinal cord and had "significant recovery" of her left arm strength and regained some mobility as a result of rehabilitation efforts, although her partial paralysis, loss of control of her bladder and bowels, and pain remained; she was also receiving treatment for depression.

6

The police arrested Quitiquit on a charge of inflicting violence on Villanueva. However, after being rehospitalized, Villanueva died in late December. Forensic pathologist, Mark Scott McCormick, performed an autopsy of her body; his review revealed that Villanueva had numerous complications as a result of quadriplegia, including chronic inflammation of her abdomen, pneumonia, a sacral decubitus ulcer (a breakdown of the skin at the tailbone), swelling of her brain and a blood infection, as well as an area of degeneration in her spinal cord.

The prosecution filed a new felony complaint against Quitiquit for murder as well as spousal abuse. Prior to trial on the charges, Quitiquit moved in limine to exclude evidence of Villanueva's statements to Dr. Kyaw and Officer Hellawell on the basis that the statements were hearsay and that their admission would violate his Sixth Amendment confrontation clause rights under *Crawford, supra*, 541 U.S. 36. The prosecutor countered that all the statements were admissible under the section 1370 exception to the hearsay rule and that the admission of Villanueva's statements to Officer Hellawell would not violate Quitiquit's confrontation clause rights because those statements were made at a preinvestigation stage and were thus not testimonial in accordance with *Crawford*. After extensive argument, the trial court agreed that the statements were admissible and denied Quitiquit's motion in limine.

At trial, the prosecution's theory was that Quitiquit caused Villanueva's death by violently twisting her neck during the March 6 argument. In support of this theory, the prosecutor introduced the evidence of Villanueva's statements to Dr. Kyaw and Officer Hellawell, as well as testimony by Anthony and Julie about the March 6 argument.

Anthony testified that as he was falling asleep, he heard Quitiquit getting angry and his mother respond by saying something like "Go ahead. Do it." He then heard Quitiquit "grunting" and Villanueva "gasp" for air and say "stop" in a frightened tone of voice. Anthony called out to Villanueva to see if she was all right and Villanueva responded in a normal tone of voice that she was "fine." Anthony heard his stepfather leave shortly thereafter. Although Anthony did not see his mother the next morning, when he returned to the house a few days later, he saw Villanueva rubbing her neck as if she was in pain. Villanueva explained away the pain by telling him that she had "slept wrong."

Julie testified that, although her father was not home when she went to bed on March 6, she later awoke when she heard her mother crying and yelling out his name. Despite her earlier statements to Officer Hellawell that she did not see anything that happened during the argument that night, Julie testified that she went to check on Villanueva and saw Quitiquit standing over her

mother, who was lying on her bed. She testified that Quitiquit angrily told her to go back to bed and she complied and that she heard her father leave the home 10 to 15 minutes later. Julie testified that the next morning, she noticed Villanueva putting warm rags on her neck and walking with a limp.

The prosecution called Dr. McCormick to testify as to the results of the autopsy and his conclusion that Villanueva died from complications of quadriplegia (most particularly sepsis) resulting from direct trauma to her neck, vascular trauma in that area or both. Prosecution expert Dr. Lorne Label testified as to his understanding that Villanueva's head was "pulled, hyperextended back and twisted, and then [she was] thrown to the ground . . . in a very violent manner" and that Villanueva's reported symptoms and the autopsy results were consistent with such an injury. He opined that those forces, rather than other causes, resulted in injury to Villanueva's cervical spinal cord and that that injury caused her ultimate quadriplegia and death.

Quitiquit's defense had two components. First, the defense focused on discrediting Villanueva's statements to Officer Hellawell, as well as the testimony of Anthony and Julie. Second, the defense challenged the prosecution's evidence of causation.

In this regard, Quitiquit elicited evidence that Villanueva had been in two auto accidents, one in 1997 and another in April 1999, that caused her back pain and neck pain, respectively. Quitiquit also introduced evidence that Villanueva experienced physical problems, including problems with her neck, and sought medical treatment for blood in her urine, side pains while breathing, constipation and hemorrhoids, in 2001. Quitiquit's daughter Corina testified that Villanueva told her in late June or July of 2002 that the doctors believed a tumor was the cause of her problems.

During defense counsel's cross-examination of Dr. McCormick, the forensic pathologist admitted that the syrinx (a fluid-filled hole) he found on Villanueva's spine could have resulted from a whiplash injury (such as from a car accident) but not manifested any symptoms until a long time afterward. Defense counsel also cross-examined Dr. McCormick regarding the fact that Villanueva's body had mistakenly been embalmed before the autopsy was performed, thus limiting the nature of the review that could be conducted, and questioned him about some conditions with which Villanueva had previously been diagnosed, but that Dr. McCormick had not noted during his examination of her body.

Finally, the defense introduced expert testimony from neuroradiologist Brian Herman, who opined that the likelihood of a trauma causing Villanueva's quadriplegia was "very, very low" and that her symptoms more likely resulted from a tumor or an infectious process. Dr. Herman testified that a twisting of Villanueva's neck in the manner described by Officer Hellawell would have resulted in damage to the bones, muscles and ligaments surrounding her spinal cord, which Villanueva did not exhibit, and would have resulted in immediate quadriplegia, rather than the progressive type that she experienced.

The jury acquitted Quitiquit of second degree murder, but convicted him of voluntary manslaughter and inflicting great bodily injury on a spouse. The trial court imposed the upper term of 11 years on the voluntary manslaughter count and the upper term of four years, concurrent, on the spousal abuse count, but stayed the latter term pursuant to Penal Code section 654. Quitiquit filed a notice of appeal from the resulting judgment in the Court of Appeal, Fourth Appellate District, Division Two; after the filing of Quitiquit's opening brief, the matter was transferred to this court by order dated February 16, 2007.

## DISCUSSION

### 1. *Admission of Villanueva's Statements*

Section 1370, subdivision (a), provides:

"Evidence of a statement by a declarant is not made inadmissible by the hearsay rule if all of the following conditions are met:

"(1) The statement purports to narrate, describe, or explain the infliction or threat of physical injury upon the declarant.

"(2) The declarant is unavailable as a witness pursuant to Section 240.

"(3) The statement was made at or near the time of the infliction or threat of physical injury. Evidence of statements made more than five years before the filing of the current action or proceeding shall be inadmissible under this section.

"(4) The statement was made under circumstances that would indicate its trustworthiness.

"(5) The statement was made in writing, was electronically recorded, or made to a physician, nurse, paramedic, or to a law enforcement official."

Quitiquit contends in part that the court erred in admitting the evidence of Villanueva's April 24 and 25 statements under section 1370 because those statements were not made "at or near the time" of the physical injury or under circumstances indicating their trustworthiness. (§ 1370, subd. (a)(3), (4).) We review the trial court's determination that the foundational requirements for admissibility have been met under an abuse of discretion standard. (*People v. Martinez* (2000) 22 Cal.4th 106, 120, 126 [91 Cal.Rptr.2d 687, 990 P.2d 563].)

## A. *The "At or Near" Requirement*

■    Although no reported California decision has addressed the scope of section 1370's "at or near" requirement, our role in interpreting the statutory language is clear; we must determine the legislative intent by focusing on the statutory terms, giving the words "their usual and ordinary meaning." (*Daun v. USAA Casualty Ins. Co.* (2005) 125 Cal.App.4th 599, 605 [23 Cal.Rptr.3d 44].) Where statutory language is unambiguous, no further interpretation is necessary or appropriate. (*Wilcox v. Birtwhistle* (1999) 21 Cal.4th 973, 977–978 [90 Cal.Rptr.2d 260, 987 P.2d 727]; *Daun, supra*, 125 Cal.App.4th at p. 605 [" 'it is our role to ascertain the meaning of the words used, not to insert what has been omitted or otherwise rewrite the law to conform to an intention that has not been expressed' "].)

■    The Attorney General contends that the scope of the "at or near" requirement of section 1370, subdivision (a)(3), is defined by reference to the second sentence of that provision, which specifies that "[e]vidence of statements made more than five years before the filing of the current action or proceeding *shall be inadmissible* under this section." (Italics added.) He contends that the latter sentence evidences a legislative intent to take statements made within five years of the filing of the action outside of the hearsay rule. However, this argument is belied by the statutory language itself, which relates to the amount of time from the time the statements are made and the time an action arising out of the injuries is filed. (§ 1370, subd. (a)(3).) It has no bearing on the scope of the "at or near" requirement, which relates to the amount of time between the threat or infliction of the injury and the declarant's statements to the testifying witness.

The plain meaning of the phrase "at or near" denotes a time close to the infliction of the injury—which in most circumstances will be within hours or days, rather than weeks or months. (See *Glatman v. Valverde* (2006) 146 Cal.App.4th 700, 704 [53 Cal.Rptr.3d 319] [forensic report of a driver's blood-alcohol level, prepared a week after his blood was tested, was not made "at or near" the time of the blood test as required for the admissibility of a public record under § 1280].) By imposing this requirement in addition

to requiring that there be other indicia of the statements' trustworthiness (§ 1370, subd. (a)(3), (4)), the Legislature evinced its intent to limit the section 1370 hearsay exception to those statements made close in time to the infliction of the injury, to provide some assurance that the statements would relate to facts fresh in the declarant's mind and reduce the risk that the statements resulted from the declarant's prevarication or coaching by third parties. (See *People v. Kons* (2003) 108 Cal.App.4th 514, 522–523 [133 Cal.Rptr.2d 520]; see also *People v. Martinez, supra*, 22 Cal.4th at p. 128.)

Such an interpretation is supported by legislative history materials underlying section 1370. Earlier versions of the proposed legislation did not include the "at or near" requirement, but instead provided that the infliction or threat of harm could not be "remote," under the circumstances, from when the statement was made. (Sen. Amend. to Assem. Bill No. 2068 (1995–1996 Reg. Sess.) June 24, 1996, § 1.) However, after the litigation section of the California State Bar objected that the proposed bill's failure to require a "temporal connection" between the unavailable witness's statement and the event to which it related (i.e., the infliction of the threat or injury) might facilitate the fabrication of statements to support a particular litigant's position (for example, in divorce cases) (Barry Rosenbaum, State Bar Litigation Section, Legislative Com., mem. to Larry Doyle, Director, Office of Governmental Affairs re Assem. Bill No. 2068 (1995–1996 Reg. Sess.) May 28, 1996, p. 3), the bill was amended to include the "at or near" language, as proposed by the litigation section so that there would be "a short time frame" between the making of the statement and the event to which it related. (Sen. Amend. to Assem. Bill No. 2068 (1995–1996 Reg. Sess.) June 24, 1996, § 1; see also Sen. Com. on Criminal Procedure, Analysis of Assem. Bill No. 2068 (1995–1996 Reg. Sess.) as amended June 17, 1996.)

■ Although a trial court retains broad discretion to determine whether a particular statement was "at or near" the infliction of the injury for the purposes of section 1370, subdivision (a)(3), we conclude that absent special circumstances, a statement about a physical injury made almost two months after its infliction does not satisfy the statutory time limit. Here, Villanueva started seeing doctors within a week after her purported injury and had numerous opportunities, as well as a motivation, to give her medical providers accurate information about circumstances that may have caused her injuries. Villanueva specifically denied that she had suffered any trauma to her neck until almost two months after the incident, a time period during which she would have had an opportunity to contrive a story or be coached by her children, at least one of whom was quite angry at Quitiquit, to do so. Under these circumstances, we conclude that section 1370's requirement that the statement be made "at or near" the time of the event is not satisfied.

B.  *The Trustworthiness Requirement*

With respect to Villanueva's statements to Officer Hellawell, we also agree with Quitiquit's contention that the prosecution failed to provide a sufficient foundation to show the statements were made under circumstances showing they were trustworthy. (§ 1370, subd. (a)(4).)

"[C]ircumstances relevant to the issue of trustworthiness include, but are not limited to, the following:

"(1) Whether the statement was made in contemplation of pending or anticipated litigation in which the declarant was interested.

"(2) Whether the declarant has a bias or motive for fabricating the statement, and the extent of any bias or motive.

"(3) Whether the statement is corroborated by evidence other than statements that are admissible only pursuant to this section." (§ 1370, subd. (b).)

The Attorney General contends that Villanueva's initial refusal to prosecute Quitiquit establishes that her statements were not made in contemplation of litigation, but instead for the purpose of making a paper trail so that she could get a protective order against him, and that she did not have any bias or motive for fabricating the statements. However, there are several problems with this argument. First, there is no evidence in the record to establish that Villanueva's motivation for the disclosure was to obtain a protective order. Second, such a motivation would in any event establish that the statements *were* made in contemplation of litigation in which Villanueva would have been the applicant seeking relief. Finally, there is no basis for believing that her statements were accurate or that she had no motive to lie. (See *People v. Pantoja* (2004) 122 Cal.App.4th 1, 13 [18 Cal.Rptr.3d 492] [a person seeking a restraining order has an interest in the outcome and thus has a "potential bias . . . and a motive to stretch the truth"].)

Further, Villanueva's specific statements to Officer Hellawell were not substantiated by other admissible evidence. Other than Villanueva's general statement to Dr. Kyaw that her husband had twisted her neck, there was no corroboration for the version of the events she described to Officer Hellawell, a violent, deliberate and intentional act in which Quitiquit grabbed her under her chin, twisted her neck and threw her from her bed onto the floor. Julie testified that she heard her parents arguing and then saw her father standing over her mother. Anthony testified that during the argument, he heard Quitiquit grunt and Villanueva gasp for air. Neither witness testified to hearing or seeing anything that would corroborate that Quitiquit violently

threw Villanueva to the floor by grabbing and twisting her neck, despite the uncontroverted evidence that the mobilehome had thin doors through which sound easily traveled.

Additionally, Villanueva spent substantial time with her children while in the hospital, providing an opportunity for them to contrive a story to explain Villanueva's medical condition. This opportunity to reflect and deliberate on the events rendered the accuracy of Villanueva's belatedly disclosed description of events to be inherently suspect (see *People v. Kons, supra*, 108 Cal.App.4th at p. 524 [noting the fact that the victim was "visiting with friends [at the hospital], who may or may not have been able to coach him about his statement" was a factor in establishing the victim's statement to police officers was not trustworthy]), particularly in light of her earlier denials that she had suffered any trauma.

An equally significant factor relating to the trustworthiness of Villanueva's statements to Officer Hellawell was the uncontroverted evidence that she was partially "incoherent" and was in a "sleep state" at the time she made the statements. Although Officer Hellawell said he believed Villanueva understood what she was saying, there is substantial question whether a person who is making statements in a "sleep state" is able to accurately recall events from seven weeks earlier or is accurately able to communicate her recollection of those events. Given her medicated condition and the fact that she had suffered substantial pain for the previous six weeks, there is a risk that Villanueva's recollection of the events was influenced by the serious symptoms she was suffering at the time she made the statements.

The evidence at trial thus did not establish that Villanueva's statements to Officer Hellawell were trustworthy so as to permit admission of the statements under section 1370. Absent the opportunity for cross-examination to test the veracity of Villanueva's statements, the jury was presented with a graphic description of Quitiquit's conduct that he could not fairly challenge at trial.

C. *Conclusion*

The prosecution failed to show that Villanueva's statements to Dr. Kyaw and Officer Hellawell were made "at or near" the infliction of the injury to which the statements related or that the statements to Officer Hellawell were made under circumstances showing the statements were trustworthy. Thus, the court erred in admitting the statements under section 1370.

2. *Prejudice*

The admission of hearsay statements erroneously admitted under section 1370 constitutes reversible error "if it is 'reasonably probable that a

result more favorable to the appealing party would have been reached in the absence of the error.' " (*People v. Pantoja, supra,* 122 Cal.App.4th at p. 13, quoting *People v. Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].) In his opening brief, Quitiquit argued that the admission of Villanueva's statements to Officer Hellawell and to Dr. Kyaw were prejudicial, a claim that the Attorney General has made no attempt to dispute despite having been granted an opportunity to file a supplemental response relating to that issue. On our review of the entire record, we agree the error was prejudicial under the *Watson* standard.

The centerpiece of the prosecution's theory in the case was that Quitiquit was guilty of murder and/or manslaughter because of the violent manner in which he committed the crime, a theory that was almost entirely dependent on the admission of Villanueva's statements to Officer Hellawell concerning Quitiquit's conduct on March 6. At the outset of her closing argument, the prosecutor stated that Quitiquit had "sealed [Villanueva's] fate by pulling her off the bed, twisting her neck in a jerking motion, and [throwing] her down to the floor." The prosecutor quoted or paraphrased Villanueva's statements to Officer Hellawell at least eight more times during the remainder of her argument, emphasizing that those statements established Quitiquit's malice (a necessary element of the murder charge) or conscious disregard of the danger to Villanueva's life (an element of the lesser included offense of voluntary manslaughter).

Further, the record establishes that the evidence of Villanueva's statements to Officer Hellawell were important to the jury's decisionmaking. Shortly after deliberations began, the jury asked to see Officer Hellawell's written report of his interview with Villanueva. After the court denied the request because the report was "not in evidence," the jury asked to have Officer Hellawell's testimony reread, strongly suggesting that the inadmissible evidence was a factor in their decision to convict Quitiquit. (See *Scott v. County of Los Angeles* (1994) 27 Cal.App.4th 125, 152 [32 Cal.Rptr.2d 643] [jury's requested rereading of erroneous jury instruction is a relevant factor in assessing prejudice].)

Because the error in admitting Villanueva's hearsay statements to Officer Hellawell and Dr. Kyaw went to the heart of the prosecutor's case against Quitiquit, it was prejudicial as to both counts of which he was convicted. Accordingly, we must reverse the judgment of conviction on the basis of that error.

## DISPOSITION

The judgment is reversed.

O'Rourke, J., concurred.

HALLER, Acting P. J., Concurring.—The majority concludes Villanueva's statements to Dr. Kyaw and Officer Hellawell were inadmissible hearsay. For the reasons explained below, I respectfully disagree with the majority's analysis on this issue. However, I concur in the result because the admission of Villanueva's statements to Officer Hellawell constituted prejudicial error on another ground. As the Attorney General admits, Villanueva's statements to Officer Hellawell were testimonial. (See *Davis v. Washington* (2006) 547 U.S. 813, 821–824 [165 L.Ed.2d 224, 126 S.Ct. 2266, 2273–2274]; *People v. Cage* (2007) 40 Cal.4th 965, 975–984 [56 Cal.Rptr.3d 789, 155 P.3d 205].) Thus, the admission of the statements violated Quitiquit's constitutional confrontation clause rights.[1] (See *Crawford v. Washington* (2004) 541 U.S. 36, 42–69 [158 L.Ed.2d 177, 124 S.Ct. 1354].) The error was prejudicial because Villanueva's statements to Officer Hellawell were the linchpin of the prosecutor's theory against Quitiquit.

My disagreement with the majority's hearsay analysis rests on my view that the trial court did not abuse its discretion in concluding Villanueva's statements satisfied the "at or near" requirement of Evidence Code section 1370, subdivision (a)(3).[2] Under this subdivision, the court must find "[t]he statement was made at or near the time of the infliction or threat of physical injury." (§ 1370, subd. (a)(3).) The dictionary defines the word "near" to mean "close" or "not far distant in time, place, or degree." (Webster's 11th Collegiate Dict. (2006) p. 828.) This definition reflects what would be the common understanding of the word "near." But it is unhelpful because the determination of what is "near," "close," or "not far distant" is necessarily relative. (See *Sublett v. City of Tulsa* (1965) 1965 OK 78 [405 P.2d 185, 202] [the word "near" is "a term of relative signification without positive or precise meaning and locates nothing with any degree of precision"].) Whether an event is "near" to another event necessarily depends on the perspective of the observer and the reason or purpose for measuring the time.

---

[1] In a supplemental brief, the Attorney General asserts for the first time that Quitiquit waived the confrontation clause violation based on the forfeiture by wrongdoing doctrine. (See *People v. Giles* (2007) 40 Cal.4th 833, 840–855 [55 Cal.Rptr.3d 133, 152 P.3d 433].) However, I am unconvinced the issue can be decided as a matter of law on the record before us. Unlike *Giles*, the evidence as to whether Quitiquit's actions were the cause of Villanueva's death was hotly disputed.

[2] All further statutory references are to the Evidence Code.

This concept of "near" as a flexible measurement of time is reflected in the California Supreme Court's analysis of the similarly worded "at or near" requirement in the public records exception to the hearsay rule. (§ 1280, subd. (b);[3] see *People v. Martinez* (2000) 22 Cal.4th 106, 126–128 [91 Cal.Rptr.2d 687, 990 P.2d 563].) In *Martinez*, the trial court relied on this exception to admit a computer generated printout of the defendant's criminal history (known as a CLETS document) for purposes of proving the criminal history, despite that there may have been a 30- to 90-day delay in recording the relevant information. (*People v. Martinez, supra*, at pp. 126–127; *id.* at pp. 140–141 (dis. opn. of Werdegar, J.).) The California Supreme Court held the trial court did not abuse its broad discretion in determining this evidence satisfied the statutory "at or near" element. (*Id.* at p. 126.) In so concluding, the *Martinez* court emphasized that the "at or near" statutory phrase " 'is not to be judged . . . by arbitrary or artificial time limits, measured by hours or days or even weeks.' [Citation.] Rather, 'account must be taken of practical considerations,' including 'the nature of the information recorded' and 'the immutable reliability of the sources from which [the information was] drawn.' [Citation.] 'Whether an entry made subsequent to the transaction has been made within a sufficient time to render it within the [hearsay] exception depends upon whether the time span between the transaction and the entry was so great as to suggest a danger of inaccuracy by lapse of memory.' (2 McCormick on Evidence (4th ed. 1992) § 289, p. 273, fn. omitted.)" (*People v. Martinez, supra*, 22 Cal.4th at p. 128; see also *Glatman v. Valverde* (2006) 146 Cal.App.4th 700, 703–706 [53 Cal.Rptr.3d 319] [applying a " 'lapse of memory' " test to section 1280's "at or near" requirement].)

After reviewing section 1370's statutory language and framework and its legislative history, I am satisfied the Legislature intended to provide the same broad discretion to a trial court in determining whether a statement was made at or near the time of the infliction of the injury, and that a lapse-of-memory test is the appropriate guide to applying the statutory requirement. In enacting section 1370, the Legislature sought to broaden the circumstances under which hearsay may be admitted at a criminal trial to ensure a jury will hear the truth about past physical abuse when the victim is no longer available to testify.[4] (Concurrence in Sen. Amends., Assem. Bill No. 2068 (1995–1996

---

[3] Section 1280 provides: "Evidence of a writing made as a record of an act, condition, or event is not made inadmissible by the hearsay rule when offered . . . to prove the act, condition, or event if all of the following applies: [¶] (a) The writing was made by and within the scope of duty of a public employee. [¶] (b) *The writing was made at or near the time of the act, condition, or event.* [¶] (c) The sources of information and method and time of preparation were such as to indicate its trustworthiness." (Italics added.)

[4] The legislation was enacted as a specific reaction to the trial court's rulings in the O.J. Simpson trial that excluded certain hearsay statements contained in the victim's diary. (Concurrence in Sen. Amends., Assem. Bill No. 2068 (1995–1996 Reg. Sess.) as amended Aug. 8, 1996, p. 2.)

Reg. Sess.) as amended Aug. 8, 1996, p. 2.) Although the Legislature imposed limits on the admissibility of this evidence to protect criminal defendants against false accusations, the Legislature sought to provide the trial court with substantial discretion to admit hearsay statements if the court is assured the statements are trustworthy and reliable. (*Ibid.*)

Given this legislative intent and the use of the relative term "near," the Legislature did not impose strict artificial time limits on the admissibility of a hearsay statement under section 1370, subdivision (a)(3). Rather, the Legislature intended to provide a trial court discretion to admit a statement if it was made when the incident was fresh in the victim's mind and not so long after the incident to put into question the statement's trustworthiness and reliability. This approach is consistent with the view of a leading commentator on California evidence law. (1 Jefferson, Cal. Evidence Benchbook (Cont.Ed.Bar 3d ed. 1998) § 18.57, p. 280 [stating that under § 1370 a statement "made within 3 months of the injury . . . should qualify as being made near the time of injury"].)

Under these principles, there was a substantial evidentiary basis for the trial court to find Villanueva's statements were made sufficiently "near" the time of the event to satisfy the statutory requirement. First, the facts supported that the event was still fresh in Villanueva's mind. Although the claimed injury occurred seven weeks earlier, the statement was about a violent traumatic event (rather than a collateral detail) that was not likely to be forgotten by the injured person.

These circumstances distinguish this case from *Glatman v. Valverde, supra,* 146 Cal.App.4th 700, upon which the majority relies. (Maj. opn., *ante,* at pp. 9–10.) In *Glatman,* forensic analysts recorded the suspect's blood-alcohol level one week after the blood sample was drawn and analyzed. In concluding the recording was not "at or near" the event, the *Glatman* court applied *Martinez*'s lapse-of-memory test and determined there was no reasonable basis to conclude that the laboratory employees could accurately memorize and then recall the specific numerical test result one week later. (*Glatman, supra,* at pp. 704–705.) This case is materially different. Villanueva was relating a violent injury that was inflicted on her and for which she remained hospitalized. The trial court had ample basis to conclude that—unlike a laboratory worker who could not reasonably "retain all the test results in his or her head"—there was no danger that Villanueva could not accurately recall this specific incident of violent conduct by her husband. (*Ibid.*)

Further, it has long been recognized that a patient's statement to his or her doctor about the patient's injuries is inherently likely to be true. Although Villanueva's prior denials are relevant in determining the reliability of her later statements, the trial court had a reasonable basis to conclude that under the circumstances the prior denials did not preclude a finding that the statements were timely made. The prosecution presented evidence that Quitiquit did not want Villanueva to disclose his abusive acts, and presented evidence from which it could be inferred that Villanueva was afraid of her husband. The trial court had a reasonable basis to find this fear adequately explained why Villanueva initially refused to disclose the assault to medical personnel or the police.

Additionally, the fact that Villanueva waited to disclose Quitiquit's conduct until the day before her hospital discharge is consistent with the surrounding circumstances. If Villanueva believed her physical condition would improve while in the hospital, she could have believed there was no reason to disclose the neck trauma. However, on the day before the hospital intended to discharge her, she had not improved and had continuing debilitating symptoms. At that point, it was reasonable for her to finally understand that it was necessary to tell the truth to her doctor to obtain proper medical treatment and to document the issue with the police.

With respect to the majority's concern that Villanueva had time to deliberate on her statements, the Legislature did not require that a statement under section 1370 be made "spontaneously while the declarant was under the stress of excitement" of the event. (§ 1240.) Thus, unlike statements admitted under the spontaneous statement hearsay exception of section 1240, the Legislature necessarily intended that the section 1370 exception would apply even if the declarant had some time to reflect on his or her statement. Although the extent of the opportunity for deliberation and reflection is an important factor in the trustworthiness analysis (§ 1370, subd. (a)(4)), it does not in and of itself render the hearsay exception inapplicable under the statutory timeliness requirement (§ 1370, subd. (a)(3)).

As with other hearsay exceptions, "[a] trial court has broad discretion in determining whether a party has established [the statutory] foundational requirements. [Citation.]" (*People v. Martinez, supra*, 22 Cal.4th at p. 120.) The determination of what is " ' "at or near" ' " " 'is a matter of degree and calls for the exercise of reasonable judgment *on the part of the trial judge.*'

[Citation.]" (*Id.* at p. 128, fn. 7, citing 1 Jefferson, Cal. Evidence Benchbook, *supra*, § 4.8, pp. 114–115.) "A reviewing court may overturn the trial court's exercise of discretion ' "only upon a clear showing of abuse." ' [Citations.]" (*Id.* at p. 120.) On the record before us, the trial court did not abuse its discretion in finding the statements were sufficiently timely to satisfy section 1370, subdivision (a)(3).

Respondent's petition for review by the Supreme Court was denied December 19, 2007, S157550.