Filed 3/8/16  P. v. Brown CA2/7

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B255316 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. MA037315) |
| v. | |
| CHRISTOPHER BROWN, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Lisa M. Chung, Judge.  Affirmed.

Peter Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Susan Sullivan Pithey and Robert M. Snider, Deputy Attorneys General, for Plaintiff and Respondent.

## INTRODUCTION

A jury convicted Christopher Brown of two counts of first degree murder. (Pen. Code § 187, subd. (a).)[1] The jury found true the special circumstance allegation that Brown had been convicted of more than one offense of murder in the first or second degree in this proceeding (§ 190.2, subd. (a)(3)). The jury also found true the allegations that Brown personally used and intentionally discharged a firearm (§§ 12022.53, subds. (b), (c)), and personally and intentionally discharged a firearm that caused death to both victims (§ 12022.53, subd. (d)). The trial court sentenced Brown to two consecutive life terms without the possibility of parole plus two consecutive terms of 25 years to life for the firearm-use enhancement under section 12022.53, subdivision (d). The court imposed and stayed additional terms of 10 years to life and 20 years to life under section 12022.53, subdivisions (b) and (c).

Brown challenges his convictions on two grounds. First, he argues that the trial court erred by admitting certain statements the victims made in telephone calls before they died that he contends were inadmissible hearsay. Second, he argues that the trial court erred by excluding evidence he argues would have provided the jury "an innocent explanation of his suspect actions" following the murders. We conclude the trial court did not commit prejudicial error, and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

This case concerns the murders of two women, Christine Bacon and her daughter Crystal Dawkins (Dawkins). Bacon abandoned Dawkins six months after her birth in Jamaica. Until the age of 17, Dawkins lived in Jamaica with her father's parents. After graduating from high school in 2005, Dawkins moved to South Carolina to live with her father, Maurice Dawkins, and his wife, Valicia Dawkins. When Dawkins turned 18, she

---

[1] All undesignated statutory references are to the Penal Code.

2

told her father she wanted to visit her mother in California. On November 17, 2006 Dawkins flew to California to spend Thanksgiving week with her mother.

Bacon shared a house in Lancaster with her boyfriend Christopher Brown. Brown claimed that he had paid for the Lancaster house and for two properties in Las Vegas, but all three properties were recorded in Bacon's name. By the summer of 2006 there were problems in their relationship. Brown had hit Bacon twice, once using a gun, and the couple had quarreled over the properties. Brown wanted Bacon to move to Las Vegas and live in one of the houses there. Bacon refused to leave the Lancaster house unless Brown paid her $10,000.

A.      *The Events Leading Up to the Murders*

On November 20, 2006 Dawkins spent the day with Dicarlo Bennett, a friend from Jamaica who had moved to California. Dawkins had her mother's cell phone, apparently because hers was not charged. Several times that day Brown called Dawkins looking for Bacon. During one call, Brown accused Dawkins of lying about not knowing where her mother was and of covering for her mother.

Later that night Bennett drove Dawkins to the Lancaster house where Brown was waiting for Bacon to return. Alone in the house with Brown, Dawkins made telephone calls to her friend Bennett and her stepmother Valicia Dawkins. Bennett testified that Dawkins was crying and fearful during their phone conversation, and she told him that Brown had "snatched" her mother's cell phone from her while cursing and "belittling" her. During another phone conversation with Bennett later that night, Dawkins, still crying, told Bennett that she wanted her mother to come home. Then Bennett heard a "little yell" and the phone call abruptly ended.

Valicia Dawkins testified that in her phone conversation with Dawkins that night, Dawkins was a "nervous wreck." Valicia said Dawkins "was kind of sobbing, crying. . . . Just jumbling a lot of stuff. I really couldn't make out what she was telling me at first, what she was saying." Valicia asked her stepdaughter to calm down and explain what was wrong. Dawkins told her that Brown was upset because Bacon was not

3

home and he did not know where she was. Brown wanted Bacon's cell phone, but Dawkins told Valicia she did not want to give it to him. Dawkins said Brown twisted her arm to get the phone from her, but she resisted. Eventually Valicia told Dawkins to give Brown the phone, which she did. Valicia then asked Dawkins if she could leave the house. Dawkins told her she wanted to leave but there was no way to get out safely "without him seeing her." Eventually Bacon returned to the house, and Dawkins told Valicia she would call her back later.

After getting the phone from Dawkins, Brown discovered that Bacon had texted a nude picture of herself to Oscar Winslow, someone she had met online. Brown called Winslow using Bacon's phone. At the time, Bacon was with Winslow at his home. After Bacon spoke with Brown and Dawkins, Bacon left Winslow's home to return to the Lancaster house, but she circled the house for a while, apparently scared to go in.

Brown called Winslow back later that night and sounded upset. Brown told Winslow that Bacon had been seeing several other men, exchanging sexually explicit photographs and emails with them, and transmitting venereal disease to him and at least one other person. Brown also told Winslow that he had paid for the house in Lancaster and an apartment in Hawthorne where Bacon also lived. Winslow eventually ended the call, but Brown called back again. In that call, Winslow could hear Bacon in the background saying "give me my phone."

At approximately 2:00 a.m. on November 21, 2006 a deputy sheriff responded to a call from Bacon asking for help in getting Brown to leave the house. Bacon met the deputy at the Lancaster sheriff's station and told the deputy that Brown had a weapon. Bacon led sheriff's deputies back to her house where Dawkins told them Brown had left voluntarily.

After Brown left the Lancaster house he went to see another girlfriend, Tasha Morris, who lived in Hawthorne. Morris awoke at 5:30 a.m. to get ready for work and saw Brown watching television. She noticed he had an extra cell phone and asked him about it, and Brown admitted the phone belonged to Bacon. He showed Morris explicit photographs of Bacon that he said she had sent to other men and he played a

4

voicemail message from Winslow to Bacon. Morris testified that Brown seemed upset and disturbed.

That morning Brown and Bacon made numerous phone calls. At approximately 7:00 a.m. Brown called Carolyn Perryman, a friend of Bacon's from work. Perryman testified that Brown was "angry" and "going on and on about various people that he believed [Bacon] had c[o]me in contact with." Brown told Perryman he felt Bacon had taken advantage of him by wanting to keep the house and a car he had paid for but still wanting to "be with other men." He also told Perryman he had given Bacon 30 days to leave the house. Perryman told Brown that Bacon planned to keep the house. In response, Brown said, "[b]efore I let her do that, I'll put her to sleep."

Meanwhile, Bacon called Brown's niece, Simone Simpson, who lived in Florida. Simpson testified that Bacon "was very upset" and crying. Bacon told Simpson that she was getting ready to go to work but wanted Simpson to call Brown and tell him to leave her alone. Bacon explained that she and Brown had been arguing and that she wanted to end her relationship with him. Bacon also said that Brown had "disrespected" her daughter and wanted her out of the house.

Simpson then called Brown as Bacon had requested. Brown told Simpson that he and Bacon had been arguing, that he took Bacon's cell phone from her daughter, and that he "found naked pictures of [Bacon] that she was sending to all the men." Simpson told Brown that Bacon wanted to end the relationship and had asked Simpson to ask Brown to leave her alone. Simpson also told Brown that Bacon said she was going to change the alarm code on the Lancaster house. "He sounded shocked that she would do that," Simpson testified. Simpson urged Brown not to go to the house because if he did the alarm would go off and "then the cops are going to get involved."

Bacon called Simpson again shortly after Simpson ended her call with Brown. Simpson testified that Bacon was still upset and crying. Approximately 20 minutes into their conversation, Simpson heard a noise like an alarm. She then heard Bacon "screaming for her daughter" and asking her who was at the door. Then the phone call ended. Simpson tried calling Bacon again but received a busy signal.

5

After talking to Simpson, Bacon received a call from Perryman, who testified that Bacon sounded "agitated and overexcited." "She was anxious, she was excited and she was . . . really, really uptight." Perryman told Bacon about Brown's call to her earlier that morning, and Bacon told her that "he's here now." Perryman testified that Bacon turned on the speakerphone to include Brown in their conversation and that Brown confirmed he had called Perryman that morning. Perryman testified that this news upset Bacon, who "just started saying, it's over, it's over." Soon after that call ended, Bacon called Perryman back and told her that she needed to convey something urgent to her, but Perryman had to go into a meeting and told Bacon she would call her back. After her meeting ended, Perryman was unable to reach Bacon.

Sometime that morning, Dawkins called her stepmother Valicia, who testified that Dawkins said "she was fine." Dawkins told her that Bacon had called the police the night before and that Brown had left the house. "She thought everything was going to be fine," Valicia testified. "I told her to make sure she called me back," but she never did.

Over the next several weeks no one was able to reach Dawkins or Bacon, and Dawkins never returned to South Carolina. Dawkins's father eventually contacted the police. On December 18, 2006 the police entered the Lancaster house and found the bodies of Dawkins and Bacon, both of whom had suffered multiple gunshot wounds. There was no sign of forced entry into the house, theft, or a struggle, and neither woman had been sexually assaulted. The medical examiner testified that the women had likely been dead for three to four weeks.

B.    *The Forensics Investigation*

Bacon was shot four times in the master bedroom where she died. Dawkins also suffered four gunshot wounds and died in a hallway leading to the master bathroom. Eight bullet casings and eight bullets or bullet fragments were recovered from the crime scene and the victims' bodies. None of the casings yielded fingerprints, and investigators never found the firearm used in the killings.

6

The forensics investigation revealed that the bullets used to shoot Bacon and Dawkins were "a caliber called .40 . . . Smith & Wesson, or another caliber called 10 mm auto." The casings all came from a .40-caliber Smith & Wesson cartridge, and all of the bullets and cartridges were fired from the same handgun. According to a forensics expert who testified at trial, the ballistics evidence collected by detectives supported the conclusion that the firearm used in the murders was likely a Smith & Wesson Model 411 .40-caliber firearm. At the time of the murders, Brown had a Smith & Wesson Model 411 handgun registered in his name.

On December 20, 2006, during a search of the Lancaster house, detectives found a box of 20 nine-millimeter rounds in a master bedroom dresser drawer containing men's clothing and a draft contract requiring Bacon to leave the Lancaster house. The detectives also found several other boxes of ammunition containing nine-millimeter, .357-caliber, .40-caliber, and .45-caliber rounds in a closet, concealed in a carton that once held soft drinks. In a later search detectives found live rounds of .40-caliber ammunition in a locked shed on the property. Inside the ammunition container detectives also found a wallet that contained Brown's insurance card.

C.    *Brown's Conduct After the Murders*

On November 22, 2006, the day after the last time anyone had any confirmed contact with Bacon or Dawkins, Brown called Morris and asked for a ride to the airport. Cell phone records place Brown's cell phone in Denver later that day and in Philadelphia by the morning of November 23, 2006. From late November 2006 to January 2007, records for various cell phones used by Brown placed those phones in Philadelphia, Miami, Tucson, South Carolina, Atlanta, and Las Vegas. During this time, Brown's cell phones collectively made over 90 calls to Bacon and Dawkins's cell phone numbers.

On December 18, 2006 detectives called one of the numbers that had recently called Bacon's phone. The person who answered identified himself as Howard Williams, who said he had seen Bacon and Dawkins in Venice on November 19 or 20, 2006. Williams also claimed that he spoke with Bacon on the phone on November 30, the week

7

after Thanksgiving. At trial, one of the investigating detectives testified that he recognized Williams's voice as Brown's voice.

On December 19, 2006 Detective William Marsh interviewed Rosemarie Jackson, a woman with whom Brown had fathered a child some years earlier. Jackson offered to call Brown in the detective's presence to inquire about Bacon. Brown told the detective he had been in Atlanta since November 22. He admitted that he shared a home with Bacon in Lancaster and that their relationship had been troubled. Brown said he had last seen Bacon and Dawkins on November 21, the day before Thanksgiving, and that he had last spoken with Bacon on November 30. Before ending the call the detective asked Brown for his phone number. Brown told him he had a new number because he had lost his old phone. The number he provided was the same number the detective called when Brown claimed he was Howard or Harold Williams. That phone number was connected to an account opened by Patrick Cook, one of several aliases detectives learned Brown used.

On that day, however, Brown was not in Atlanta, as he told police, but in Miami, visiting his niece Simpson. He told Simpson that Bacon had been found dead and Dawkins was missing. He said that detectives had asked him to return to California to help find Dawkins and that he intended to do so, but two days later he flew to Philadelphia instead. Simpson learned later that Dawkins was dead.

On December 20, 2006 Brown and Detective Marsh exchanged several calls. In the course of their conversations, Brown admitted that he owned two guns, one of which had been stolen, and that he had ammunition stored in the shed at the Lancaster house. At the end of their last call Detective Marsh told Brown he would call him back, but Brown never answered his calls and never responded to the detective's attempts to reach him.

In January 2007 Brown visited Morris for one night in Hawthorne before traveling to Arizona. Morris asked Brown about the division of property with Bacon. She testified that Brown became agitated and neither responded to her question nor informed her that

8

Bacon was dead. After not hearing from Brown for several days, Morris called Simpson, who told her that Bacon and Dawkins had been killed.

On January 5, 2007 Detective Marsh spoke again with Jackson. She told him she had spoken with Brown the previous week and that he had told her he was going to return to Los Angeles by January 3 to meet with the detectives. Brown never contacted the police, and Detective Marsh was unable to reach Brown despite numerous attempts. Brown was arrested in Arizona for the murders of Dawkins and Bacon on January 18, 2007.

## DISCUSSION

Brown contends that the trial court erred by admitting into evidence testimony by Valicia Dawkins, Bennett, Simpson, and Perryman that repeated statements made by Bacon and Dawkins before they died. Brown argues that the statements were inadmissible hearsay. Brown also argues the trial court erred by excluding as inadmissible hearsay evidence of certain statements he claims he made to Detective Marsh.

Hearsay is "evidence of a statement that was made other than by a witness while testifying at the hearing and that is offered to prove the truth of the matter stated." (Evid. Code, § 1200; *People v. Seumanu* (2015) 61 Cal.4th 1293, 1307.) "Hearsay is inadmissible unless it qualifies under some exception to the hearsay rule." (*People v. DeHoyos* (2013) 57 Cal.4th 79, 132; see Evid. Code, § 1200, subds. (a), (b).) An out-of-court statement not offered to prove the truth of the matter stated is not hearsay. (*People v. Ervine* (2009) 47 Cal.4th 745, 775-776.)

This appeal involves a series of out-of-court statements made by Bacon and Dawkins during their telephone conversations on November 20 and 21, 2006, some of which are hearsay and some of which are not, as well as two exceptions to the hearsay rule, Evidence Code section 1240 and Evidence Code section 1241. Evidence Code section 1240 makes admissible a "spontaneous statement" that narrates, describes, or

9

explains an act, condition, or event perceived by the declarant and that "[w]as made spontaneously while the declarant was under the stress of excitement caused by such perception." (*Ibid*.) Evidence Code section 1241 makes admissible so-called contemporaneous statements that are "offered to explain, qualify, or make understandable conduct of the declarant . . . made while the declarant was engaged in such conduct." (*Ibid*.)

"'[A]n appellate court applies the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence.'" (*People v. Kopatz* (2015) 61 Cal.4th 62, 85; see *People v. Dean* (2009) 174 Cal.App.4th 186, 193 ["'[a]s a general matter, a trial court is vested with broad discretion in ruling on the admissibility of evidence'"].) This abuse of discretion standard applies to review of rulings on whether an exception to the hearsay rule applies. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1007-1008; *People v. Zavala* (2013) 216 Cal.App.4th 242, 249.) An abuse of discretion arising from the admission or exclusion of hearsay requires reversal only where it is "'reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.'" (*People v. Pantoja* (2004) 122 Cal.App.4th 1, 13, quoting *People v. Watson* (1956) 46 Cal.2d 818, 836; see *People v. Page* (2008) 44 Cal.4th 1, 42.)[2]

---

[2]     Brown contends that the trial court's various errors in admitting and excluding hearsay statements violated his federal constitutional rights to due process and to present a defense. In general, however, "the application of ordinary rules of evidence does not implicate the federal Constitution." (*People v. Harris* (2005) 37 Cal.4th 310, 336 (*Harris*); see *People v. DeHoyos*, *supra*, 57 Cal.4th at p. 120 ["'violations of state evidentiary rules do not rise to the level of federal constitutional error'"].) Therefore, we apply the "reasonable probability" standard of *People v. Watson*, *supra*, 46 Cal.2d at p. 836, to any such errors rather than the more stringent "harmless beyond a reasonable doubt" standard of *Chapman v. California* (1967) 386 U.S. 18, 24. (See *Harris*, *supra*, 37 Cal.4th at p. 336.) Brown does not contend that the trial court's alleged errors violated his Sixth Amendment right of confrontation, which in any case is not implicated here because the statements he complains the trial court admitted were not testimonial. (See *Michigan v. Bryant* (2011) 562 U.S. 344, 358-359 [statement is testimonial where primary purpose was to create a record for trial]; *People v. Barba* (2013) 215 Cal.App.4th

A.    *The Trial Court Did Not Abuse Its Discretion in Admitting Statements Attributed to Bacon and Dawkins, and Even if There Were Error, It Was Harmless*

1.    Testimony of Valicia Dawkins

Over Brown's hearsay objections, the trial court admitted Valicia's testimony about the two telephone conversations she had with her stepdaughter on the night of November 20 and the morning of November 21, 2006. With regard to the conversation of November 20, Valicia testified that Dawkins was "a nervous wreck," "sobbing, crying," "[j]ust jumbling a lot of stuff." When asked whether Dawkins expressed "what she wanted to do or where she wanted to go because of the situation," counsel for Brown objected that the question called for hearsay, but the court overruled the objection. Valicia then testified that Dawkins mumbled something about her mother's boyfriend, explained that her mother was not home, and said that Brown was upset because he did not know where Bacon was.

Counsel for Brown again objected and asked for a "running objection" to what he expected would be statements that Dawkins made to Valicia. The court granted counsel's request and stated that the court would "preserve it on state and federal constitutional grounds." Valicia then testified that Dawkins said Brown wanted her mother's cell phone and attempted to get it from her by twisting her arm. Valicia testified that after she told Dawkins to give Brown the phone, Dawkins told her Brown was trying to unlock the phone to see whom Bacon had called and to try to find her. Valicia then asked Dawkins if she could leave the house, and Dawkins told Valicia she could not leave "safely" without Brown "seeing her." Eventually, Bacon returned to the house and the conversation ended.

---

712, 725-726 [testimonial statements are those made to create an "out-of-court substitute for trial testimony"].)

11

Valicia then provided a summary of her conversation with Dawkins on the morning of November 21, apparently still subject to counsel for Brown's running objection.[3] Valicia said Dawkins told her "she was fine" and "everything was okay."

The People contend the trial court properly admitted the portions of Valicia's testimony to which counsel for Brown (may have) objected as non-hearsay, spontaneous statements, or contemporaneous statements. Some of Valicia's testimony was admissible because it was not hearsay. For example, her testimony describing nonassertive, emotional behavior such as "sobbing" is not hearsay, and that testimony did not recount statements by Dawkins. (See *People v. Rogers* (2009) 46 Cal.4th 1136, 1162 [statements "describ[ing] nonverbal, nonassertive, emotional behavior" are not hearsay]; *People v. Jurado* (2006) 38 Cal.4th 72, 128-129 (*Jurado*) ["emotional displays [are] nonassertive conduct, and thus not within the hearsay rule"].) Similarly, Valicia's perceptions of Dawkins during their conversation as nervous, unhappy, and crying are not hearsay. (See *Jurado*, *supra*, at pp. 128-129.) In addition, Valicia's statement urging Dawkins to give Brown the cell phone is not hearsay because it was a request that was not made for the truth of any fact. (See *Jurado*, *supra*, at p. 117 [a request, order, or directive "does not assert the truth of any fact, [and] it cannot be offered to prove the truth of the matter stated"]; *People v. Garcia* (2008) 168 Cal.App.4th 261, 289 ["[r]equests and words of

---

[3]     We question the propriety of a "running objection" under Evidence Code section 353, which requires "a specific objection, directed to a particular, identifiable body of evidence" in order to preserve an evidentiary issue for appeal. (*People v. Crittenden* (1994) 9 Cal.4th 83, 127; see *Boeken v. Philip Morris Inc.* (2005) 127 Cal.App.4th 1640, 1676 [a "running" or "standing" objection may not satisfy Evidence Code section 353].) In this case, where multiple witnesses testified about the contents of multiple telephone conversations, and counsel for the defendant made multiple objections on multiple grounds, counsel did not create a clear record of the statements to which he objected and the grounds for those objections. Nor has Brown on appeal clearly identified the testimony that he argues the trial court improperly allowed. Instead, he merely summarizes the telephone conversations Bacon and Dawkins had on November 20-21, 2006 and argues that the trial court should not have admitted any of the testimony concerning those conversations. Nevertheless, we have reviewed the entirety of the testimony of Valicia and the other witnesses to determine, as best we can, the questions to which counsel for Brown objected.

direction generally do not constitute hearsay"]; *People v. Reyes* (1976) 62 Cal.App.3d 53, 67 ["[a] declarant's words of direction or authorization do not constitute hearsay since they are not offered to prove the truth of any matter asserted by such words"].)

Other portions of the rest of Valicia's testimony, although hearsay, were admissible under the exception for spontaneous statements. "A statement may be admitted, though hearsay, if it describes an act witnessed by the declarant and '[w]as made spontaneously while the declarant was under the stress of excitement caused by' witnessing the event." (*People v. Gutierrez* (2009) 45 Cal.4th 789, 809 (*Gutierrez*); see Evid. Code, § 1240.) "'"To render [statements] admissible [under the spontaneous declaration exception] it is required that (1) there must be some occurrence startling enough to produce this nervous excitement and render the utterance spontaneous and unreflecting; (2) the utterance must have been before there has been time to contrive and misrepresent, i.e., while the nervous excitement may be supposed still to dominate and the reflective powers to be yet in abeyance; and (3) the utterance must relate to the circumstance of the occurrence preceding it."'" (*Gutierrez*, *supra*, at pp. 809-810; see *People v. Bryant* (2014) 60 Cal.4th 335, 416.) "Spontaneous statements are deemed sufficiently trustworthy to be admitted into evidence because ""'in the stress of nervous excitement the reflective faculties may be stilled and the utterance may become the unreflecting and sincere expression of one's actual impressions and belief.""'" (*Gutierrez*, *supra*, at p. 810.) "The crucial element in determining whether an out-of-court statement is admissible as a spontaneous declaration is the mental state of the speaker." (*Id.* at p. 811.) Thus, "'[t]he nature of the utterance—how long it was made after the startling incident and whether the speaker blurted it out, [f]or example—may be important, but solely as an indicator of the mental state of the declarant.'" (*Ibid.*)

"Whether an out-of-court statement meets the statutory requirements for admission as a spontaneous statement is generally a question of fact for the trial court, the determination of which involves an exercise of the court's discretion. [Citation.] We will uphold the trial court's determination of facts when they are supported by substantial

13

evidence and review for abuse of discretion its decision to admit evidence under the spontaneous statement exception." (*People v. Merriman* (2014) 60 Cal.4th 1, 65.)

Brown argues that the statements Valicia attributed to Dawkins do not qualify as spontaneous statements because the attempt to take the phone from Dawkins was not "sufficiently startling" and her subsequent statements were not sufficiently related to that event. Valicia's testimony made clear, however, that Dawkins's mental state prevented her "from reflecting on and fabricating her account of what had happened." (*People v. Clark* (2011) 52 Cal.4th 856, 926.) A short time before Dawkins spoke to Valicia, Brown—an older man whom the teenager Dawkins had just recently met—had repeatedly called her and questioned her about Bacon's whereabouts, accused her of lying to him and covering for her mother, made belittling and disrespectful comments to her, and physically tried to wrest Bacon's phone from her by twisting her arm. Dawkins's statements to Valicia were contemporaneous with these events or were made shortly after they occurred, and Dawkins's statements related to those events. The trial court did not abuse its discretion by admitting the statements Dawkins made to Valicia on the night of November 20.

Tellingly, Brown concedes that the taking of the phone from Dawkins was sufficiently startling to render her subsequent statements "spontaneous and unreflecting," but he argues it was not sufficiently startling to qualify them under the spontaneous statements exception. The touchstone of a hearsay exception, however, is the trustworthiness of the testimony. (See *Gutierrez*, *supra*, 45 Cal.4th at p. 810.) An out-of-court statement submitted for its truth becomes trustworthy when that statement was made spontaneously precisely because it is made without reflection. (See *People v. Merriman*, *supra*, 60 Cal.4th at p. 66 ["[p]ermitting the admission of an out-of-court statement satisfying all of the requirements of Evidence Code section 1240 is based upon the long-held recognition that a statement uttered while under the stress of excitement interferes with the process of reflection and fabrication, and therefore is considered a true expression of the declarant's observations and impressions"]; *People v. Farmer* (1989) 47 Cal.3d 888, 903 [Evidence Code section 1240 was intended to admit out-of-court

14

statements made "without deliberation or reflection"].)  The trial court properly admitted these statements under Evidence Code section 1240.

By the morning of November 21, the "stress of nervous excitement" surrounding the events of the previous evening may have subsided.  (See *Gutierrez*, *supra*, 45 Cal.4th at p. 811.)  Indeed, Dawkins told Valicia that morning that she was "fine."   Thus, statements Dawkins made to Valicia on the morning of November 21 may not have been made "spontaneously while the declarant was under the stress of excitement caused by such perception."  (Evid. Code, § 1240.)

To the extent Dawkins's statements to Valicia that Bacon had called the police the night before and that Brown had left the house were hearsay not subject to an exception, however, any error in their admission was harmless because these facts came into evidence without objection through the testimony of deputies involved in the case.  (See *People v. Jenkins* (2000) 22 Cal.4th 900, 1016 [any error in admitting cumulative hearsay evidence was harmless beyond a reasonable doubt]; *People v. Houston* (2005) 130 Cal.App.4th 279, 296 ["[t]he admission of cumulative evidence, particularly evidence that is tangentially relevant to establishing a defendant's guilt, has been found to be harmless error"].)  For example, one of the deputies testified that he met with Bacon in the early morning hours of November 21, 2006 at the Lancaster station where Bacon asked for help removing Brown from the house.  Upon arriving at the house, however, Dawkins told the deputy that Brown had already left.  Because this testimony conveyed the same information as the statements Brown contends were inadmissible through Valicia's testimony, there is no reasonable probability that the result would have been any different had the trial court sustained a hearsay objection to this portion of Valicia's testimony.  (See *People v. Bryant*, *supra*, 60 Cal.4th at pp. 414-415 [any error in admitting hearsay statement was harmless because another witness's statements that "conveyed the same information" were "properly admitted"]; *People v. Riccardi* (2012) 54 Cal.4th 758, 804 [any error in admitting hearsay evidence was "substantially mitigated by other admissible evidence"].)

15

2.     Testimony of Dicarlo Bennett

Over Brown's hearsay objections, and following arguments of counsel, the trial court admitted Bennett's testimony relating statements Dawkins made to him in two phone conversations on the night of November 20. The court specifically found such statements were "spontaneous excited utterance[s]."

Brown argues that the court erred by admitting Dawkins's statements that Brown had snatched Bacon's phone from her, cursed at her and belittled her, and made her fearful. He also contends the court should not have admitted Bennett's testimony that Dawkins was crying and said she wanted her mother to come home or that Dawkins's phone went dead during their conversation.

Bennett's testimony that Dawkins was crying and wanted her mother to return, and that the phone went dead, was probably not hearsay. In any event, Dawkins's conversations with Bennett were contemporaneous with her calls to her stepmother during which she was "under the influence" of Brown's aggressive behavior toward her. (See *People v. Clark, supra*, 52 Cal.4th at p. 926.) Like Dawkins's stepmother Valicia, Bennett testified that Dawkins was crying and upset because Brown had "snatched the phone from her" and "cuss[ed] at her." Such testimony supports the trial court's finding that Dawkins's statements were made while under the stress of those events. (See *People v. Ledesma* (2006) 39 Cal.4th 641, 709 [determination that victim's statement about a robbery occurred while under the stress of that event was supported by testimony that he seemed nervous and scared].) Moreover, her statements to Bennett related to those events. The trial court did not abuse its discretion by admitting Bennett's testimony.

3.     Testimony of Simone Simpson

Brown also argues that the trial court erred by admitting testimony by Simpson describing the two phone conversations she had with Bacon the morning of November 21, 2006. Counsel for Brown, however, did not object to the admission of most of Simpson's testimony about her conversations with Bacon, nor did he request a(n improper) "running objection" as he had during Valicia's testimony. The testimony

16

admitted without objection included statements by Bacon to Simpson that she and Brown were having problems, that she was going to change the alarm code on the house, and that Brown had "disrespected" Dawkins. Simpson also testified without objection that, while she was on the phone with Bacon, she heard an alarm go off and Bacon screaming for Dawkins just before the line went dead. Brown has forfeited his right to contest the admission of these statements on appeal by failing to object at trial. (See Evid. Code, § 353, subd. (a); *People v. Stevens* (2015) 62 Cal.4th 325, 334 [defendant forfeited argument evidence was inadmissible hearsay by failing to object at trial]; *People v. Tafoya* (2007) 42 Cal.4th 147, 166 [defendant forfeited federal confrontation clause argument by failing to raise it at trial].) Moreover, even if counsel for Brown had objected, any error in the admission of these statements was harmless because the substance of virtually all of the testimony Brown argues contained inadmissible hearsay came into evidence without objection or pursuant to a hearsay exception through other witnesses or other lines of questioning. (See *People v. Riccardi*, *supra*, 54 Cal.4th at p. 804.)

The portions of Simpson's testimony admitted over Brown's hearsay objection and preserved on appeal include statements that Bacon told Simpson that she and Brown were not getting along, that they had argued, and that she wanted out of the relationship. Simpson's testimony also included complaints to Simpson that Brown had disrespected her daughter, did not want her in the house, and had taken Bacon's cell phone, and that Bacon asked Simpson to call Brown and ask him to leave her alone.

Many of these statements came into evidence without objection later during Simpson's testimony. For example, Simpson testified without objection that both Bacon and Brown told her their relationship was troubled and that Brown told her he had taken Bacon's cell phone from Dawkins. Simpson also testified without objection that she told Brown that Bacon had asked her to tell him to stay away from Bacon. Thus, any error resulting from the admission of these statements in Simpson's earlier testimony was harmless. (See *Riccardi*, *supra*, 54 Cal.4th at p. 804.)

17

### 4. Testimony of Carolyn Perryman

Finally, Brown argues that the trial court erred by admitting certain testimony by Carolyn Perryman, Bacon's friend from work. During two telephone calls on the morning of November 21, 2006, both of which occurred after the alarm had sounded at the Lancaster house, Perryman testified that Bacon sounded "agitated and overexcited." Perryman said Bacon "was anxious" and "really, really, uptight."[4] Perryman told Bacon that Brown had called her that morning and Perryman summarized their conversation. In response, Bacon told Perryman "he's here now," which drew a hearsay objection from counsel for Brown. Counsel for Brown also objected to Perryman's testimony that Bacon addressed someone else during their phone conversation and that what she said to that person had to do with Brown.

Bacon's statements that "he's here now" and Perryman's testimony regarding what she heard between Bacon and Brown were admissible under the hearsay exceptions for spontaneous and contemporaneous statements. Perryman's testimony consisted of statements made by Bacon under the stress of having Brown enter her home the morning after she had gone to the police for help ejecting him and had asked Simpson to tell Brown to stay away from her. Bacon's statements to Perryman reflected the circumstances causing that stress and were admissible under Evidence Code section 1240.

Bacon's statements and Perryman's testimony regarding what she heard between Bacon and Brown were also admissible as contemporaneous statements under Evidence Code section 1241 or non-hearsay verbal acts. Bacon's statement that "he's here now" explained her agitated conduct; i.e., Brown's presence explained why she sounded "really, really uptight." The statements Perryman heard Bacon and Brown make to each other were arguably not hearsay because it appears the People were trying to establish that Brown was in the house and that Bacon was speaking to him, not for the

---

[4]    It is unclear whether Brown contests the admission of these statements as inadmissible hearsay. In any event, they are not hearsay; they are Perryman's observations. (See *Jurado*, *supra*, 38 Cal.4th at pp. 128-129.)

truth of whatever statements they made to each other. (See Simons, Cal. Evidence Manual (2016 ed.) § 2:47, pp. 135-136 [distinguishing between contemporaneous statements and verbal acts, which are not hearsay].) In any event, the statements were admissible under section 1241. (See *id*. at p. 136 [citing *People v. Marchialette* (1975) 45 Cal.App.3d 974, 980, which held that statements of defendant and victim heard over the phone by the witness were admissible].) Finally, any error from the admission of these statements was harmless because Perryman later testified that, in the same phone call, Bacon put Brown on the speakerphone and all three participated in the conversation. Counsel for Brown did not object to this testimony, which indicated that Brown was in the house with Bacon and that Bacon was speaking to him.[5]

Brown also contests the admissibility of Perryman's testimony that Bacon told her "I need to talk to you; it's really important" and that Perryman responded they would have to talk later because Perryman needed to go to a meeting. The People offered this testimony to demonstrate Perryman's state of mind in ending the call with Bacon. These statements were not hearsay. They were verbal conduct consisting of a proposal to perform an act and a response to that proposal offered, not for their truth, but to demonstrate why Perryman did not continue speaking with Bacon at that time. (See *People v Cowan* (2010) 50 Cal.4th 401, 472 ["a proposal to perform an act" is "'neither inherently true nor false'" and thus is not hearsay].)

      B.    *Any Error in the Exclusion of the Statement Brown Allegedly Made to Detective Marsh Was Harmless*

To rebut Detective Marsh's testimony that he attempted to contact Brown numerous times on December 20, 2006 without success and that Brown told Jackson he would meet with police on January 3, 2007 but never did, counsel for Brown sought to

---

[5]    Counsel for Brown similarly did not object at trial to Perryman's testimony that Bacon told her that her relationship with Brown was over, thus forfeiting the argument. In any event, the fact that the relationship was troubled was already in evidence without objection.

19

elicit testimony from Detective Marsh about a conversation Marsh had with Brown in which Brown allegedly told him his attorney had advised him not to speak with the police about what he knew. Brown claims that he met with the attorney who gave him this advice on January 11, 2007.

The People objected to the introduction of this testimony, arguing it was self-serving hearsay. Counsel for Brown argued that the testimony would explain Brown's state of mind regarding his failure to contact Detective Marsh. The court sustained the People's objection, ruling that the testimony was self-serving, would create "undue speculation" among the jurors, and lacked relevance.

Brown contends that his statement to Detective Marsh is not hearsay because he sought to introduce it not for its truth but to show his state of mind. He further argues that even if it is hearsay, it was admissible under Evidence Code section 1250 as a statement of the declarant's then-existing state of mind. The People concede that the statement evidenced Brown's state of mind but argue that the court properly excluded it as untrustworthy under section 1252 of the Evidence Code.[6] The People also contend that the statement was irrelevant to Detective Marsh's direct testimony that he unsuccessfully attempted to contact Brown numerous times on December 20, 2006 because Brown conceded that he did not speak with an attorney until January 11, 2007.

Even if the trial court erred by excluding this statement, any error was harmless. The probative value of the statement Brown claimed he made to Detective Marsh was slight. Brown argues that his excluded statement would have explained why he "did not contact the police after his last conversation with [Detective] Marsh." But his "last conversation" with Detective Marsh was on December 20, and Brown concedes that he did not speak to an attorney until three weeks later, on January 11. During that time, Brown told both Jackson and Simpson that he would speak to police, but he never did, and he never offered any other evidence to explain his failure to do so. Evidence that he

---

[6]     Evidence Code section 1252 provides that statements qualifying as exceptions to the hearsay rule may nevertheless be excluded "if the statement was made under circumstances such as to indicate its lack of trustworthiness."

did not speak to police after January 11 on the advice of counsel did not explain his silence until that date.  There is no reasonable probability that, had the trial court admitted the statement, the result would have been any different.  (See *Harris*, *supra*, 37 Cal.4th at p. 341 [error is harmless where "[a]t most, the additional evidence the jury would have heard was of marginal value"].)

## DISPOSITION

The judgment is affirmed.


SEGAL, J.

We concur:



PERLUSS, P. J.



ZELON, J.