Filed 10/22/21  P. v. Hollars CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Plumas)

----

| | |
|---|---|
| THE PEOPLE, | C090021 |
| Plaintiff and Respondent, | (Super. Ct. No. 9824561) |
| v. | |
| DAVID WAYNE HOLLARS II, | |
| Defendant and Appellant. | |

Defendant David Wayne Hollars II appeals from the trial court's order denying his petition for resentencing under Penal Code section 1170.95.[1]  Defendant contends the trial court erred by summarily denying his petition after determining he failed to establish a prima facie case under the provisions of the statute.  He argues the trial court should have issued an order to show cause and allowed the petition to proceed for full

---

[1] Further undesignated statutory references are to the Penal Code.

1

consideration on its merits.  We agree the trial court erred in denying defendant's petition and shall reverse and remand for further proceedings.

## I.  BACKGROUND

In September 1998, defendant and codefendant Donald Engel were charged with committing multiple crimes against the victim, Matthew Black, in August 1998, including willful, deliberate, and premeditated murder (§ 187, subd. (a)—count I), robbery (§ 211—count II), first degree burglary (§ 459—count III), and conspiracies to commit murder, burglary, and robbery (§ 182, subd. (a)(1)—counts IV through VI).  It was further alleged that the murder was committed during the commission of a robbery and burglary (§ 190.2, subd. (a)(17)), and that it was especially heinous, atrocious, or cruel, manifesting exceptional depravity (§ 190.2, subd. (a)(14)).

At a preliminary hearing in March 1999, Zachary Shaw testified that approximately a week before Black was killed, Engel told him that he believed Black had stolen about $3,200 from him that Black used to repay a debt at the service station where he worked after he was caught skimming money from the register.[2]  To get the money back, Engel said he would go as far as burglary or even murder, although he would like to avoid it.  Defendant was not present during this conversation.

A day or two before Black was killed, Shaw spoke with Engel and Ronald "Bo" Miller at Samuel Stout's house about the plan to get the money back from Black.[3]  Defendant was not present.  During the conversation, the three discussed killing Black. Engel told Shaw and Miller that someone would need to hold Black down or club him in the head to knock him out, and then they could slit his throat or use some other means to kill him.  Afterwards, they could go to Black's workplace and retrieve the money inside.

---

[2]  Shaw was originally charged with defendant and Engel, and ultimately pled to lesser included offenses.

[3]  Stout was Miller's former brother-in-law.

Around 6:00 or 7:00 p.m. the day before Black was killed, Shaw, Engel, and Miller again spoke of the plan to kill Black and then burglarize his work. They planned to offer Black methamphetamine to entice him to go with them, and then they would take him down to the river, kill him somehow, and then throw his body into the river. According to Shaw, Engel and Miller had concocted the plan. Defendant was not present for this conversation.

Later that night, around 9:00 or 10:00 p.m., Shaw, Miller, and Engel brought Black to Samuel Stout's house after picking him up in Greenville. Defendant, Stout, and another man were already at Stout's house. While there, Miller told Shaw that defendant was going to come along because Miller was worried he would not be able to hold Black down.

Engel, Miller, Shaw, defendant, and Black left Stout's house around 11:00 p.m.; defendant drove Miller's car out to an area near Quarry Road. Engel laid out what appeared to be methamphetamine, although it was fake, and Black snorted the first line. Defendant then hit Black on the back of the neck with the rubber handle of a hammer. At some point, Shaw saw Engel raise a tire iron over Black, which he believed was used to hit Black. Later, Shaw saw Engel try to strangle Black with a guitar wire. The wire began to cut Engel's hands, and he yelled out that he would have to break Black's neck instead.

Black stood up and ran off down an embankment, and defendant and Engel followed him; Shaw and Miller remained behind at the car, and Shaw could not see or hear what happened next. About 20 minutes later, Engel returned to the car and drove Shaw and Miller to where Black was lying face down on the ground about a mile away. According to Shaw, Black was not moving and there was blood near his head.

Defendant told Shaw to watch the road for cars. Shaw then saw either defendant or Engel throw a rock over Black's head, although he was not sure which one did it. He heard defendant and Engel discuss going through Black's pockets. Engel later told the

3

group that he had found keys on Black, which they were going to try to use to get into his trailer.[4] Before leaving, he heard Miller, defendant, and Engel talking, and then Black's body was thrown over an embankment.

Engel, defendant, Miller, and Shaw drove to Black's trailer and tried the keys Engel had taken from Black. They could not open the door, so defendant opened a window and crawled inside. Shaw remained outside while the others went inside. Shaw later entered the trailer and snorted methamphetamine he found there. Engel and defendant emerged with two duffel bags full of personal items, including cash.

Shaw admitted that he had consumed alcohol and methamphetamine before Black's death, which often "jumbled" his mind. He did not recall telling officers after his arrest that the plan was to simply get the money back from Black. He went along because he wanted to participate in the burglary, although not in any physical confrontation with Black.

Miller testified somewhat differently than Shaw. According to Miller, he was not involved in any conversations about killing Black. While Engel had mentioned he had been ripped off, he never specified how much or by whom, and Miller and Engel never discussed Black before Black's death. After Black was killed, Engel told Miller that he had gotten his revenge and retrieved the money he had wanted.

Miller claimed he did not know about a plan to kill Black and rob his trailer until after Black had already been killed. Nor did defendant ever tell him that he was aware of Engel's plan before Black was killed. Miller only became aware of the intent to harm Black "[a]fter they had struck him."

Miller testified that he, defendant, Shaw, and Engel picked up Black from his house at the gas station; they did not discuss any plans regarding Black. Engel drove his

---

[4] Black apparently lived in a trailer where he worked.

4

car, and Engel and defendant "kind of forced" or urged him to go along. They returned to Stout's house, played video games, and later Miller, defendant, and Engel went to the store where they did not discuss Black. Upon returning to Stout's house, they got Black and Shaw and all five men drove to Quarry Road. Engel again forced Miller to come along and told him not to act jittery. Miller denied ever telling Stout about being involved with, or having second thoughts about, a plan to hurt Black. He also denied saying "[p]ray for me" as the group left.

When they stopped on Quarry Road, everyone got out of the car and Engel crushed up fake methamphetamine and Black snorted the first line. Defendant then struck him with the handle of a hammer. When Black asked, "What the heck was that," defendant responded that Black seemed to owe them money. Black asked, "What, $20?" Defendant struck him again. Miller saw Engel hit Black with a tire iron. Miller also heard Engel say he was going to strangle Black,[5] and that he was going to break his neck; Black got up and ran over an embankment. Engel and defendant followed while he and Shaw remained with the car. Engel returned and drove them to a second location on Quarry Road where Black's body was lying in the road. Black appeared to be dead; he was not moving, there was a pool of blood nearby, and he had a large stick in his mouth. Shaw was instructed to watch the road for cars, and then defendant and Engel searched Black's body. Miller could not recall who smashed a rock over Black's head before his body was thrown over the edge of the roadway after he said they could not put Black in his car. The group then went to Greenville and stole items from Black's trailer. Miller admitted entering Black's trailer to carry out a duffel bag he had been instructed to put in the car and denied taking a cut of money.

---

[5] After Black was killed, Engel instructed Miller to put a guitar string in a plastic bag in the car.

After invoking his Fifth Amendment rights, Stout testified under grant of immunity that a few days before Black was killed, Miller had told him about a plan to kill Black and said he did not want to go. He did not disclose who was involved in the plan or why they wanted Black dead. Stout told Miller not to go. Before the group left Stout's house for Quarry Road on the night Black was killed, both Miller and Engel told Stout, "pray for me."

After Black was killed, defendant told Stout that he had hit Black several times with a tire iron. According to Stout, he had given Miller a tire iron sometime before Black's death. Defendant also told Stout that his dog was licking brains off his shoes all day long. Stout later noticed a hammer with a rubber handle was missing from his house.

The prosecutor also introduced an interview and transcript of defendant's post arrest statement to police. During the interview, defendant said he did not go with the others to pick up Black, and that the plan was that Engel "was only supposed to beat him up a little bit," but Engel went "agro." Defendant admitted hitting Black first with the rubber end of a hammer, not the "business end of it." He told police he was just supposed to knock Black out like you see on television when someone gets hit in the back of the neck. According to defendant, Black was supposed to get tied up and taught a lesson.

Defendant admitted hitting Black three times, twice with the handle of the hammer and once with his hand; Black hit defendant in the head. Engel then "took [him] on." Black attempted to run away, Engel took off after him, and defendant followed. In the dark, defendant and Black apparently fell over the same cliff and came to rest near one another. Defendant said Black did not move or get up, but he made weird sounds. After Engel hit Black in the head with a rock, and after Black had stopped breathing, defendant also struck Black with a rock. Defendant denied putting a stick in Black's mouth.

Defendant stated that he was not even supposed to go with the group, and that he was not even involved in the plan. He described how Engel managed to talk Miller and

6

Shaw "into this wacky ass fucking idea of beating [Black] up and making him give [Engel] the money, or whatever he had planned." Defendant denied knowing that killing Black was part of any plan. Defendant further stated that while they were at Stout's house before Black was killed, Engel reiterated that the plan was to take Black, beat him up, and make him give Engel what he owed him.

Following the preliminary hearing, defendant was held to answer on all charges. In March 2000, defendant agreed to plead guilty to first degree murder in exchange for dismissal of the remaining counts and allegations, and he was sentenced to an indeterminate term of 25 years to life in state prison. The parties stipulated that the preliminary hearing transcript could serve as the factual basis for the plea.

In addition to the preliminary hearing transcript, the prosecutor, at the court's behest, also briefly described the facts underlying defendant's plea as follows: defendant, Engel, Shaw, and Miller, after some discussion at Stout's residence, went to Greenville where they picked up Black. On the way there, they discussed plans to assault Black over what Engel believed was a debt Black owed to him. The group picked up Black and returned with him to the Quincy area, and they hung out at Stout's house for a period of time. They represented to Black that they had some "killer meth" to share with him, and they drove with Black out to the Quarry Road area where they got out and offered Black ground up, over the counter medicine simulating methamphetamine. When Black was offered the fake methamphetamine, defendant and Engel assaulted him with a hammer and tire iron. After beating him to the ground, Black rose and ran from them, went over a 10 to 20 foot cliff where he was pursued by defendant and Engel, who essentially finished him off with a big rock that was found blood-stained at the site. They then proceeded to Black's residence/service station to loot property and money and proceeded to Oroville to try to find drugs with that money.

The prosecutor acknowledged that his brief summary for the court was only "intended to create an overview and not [describe] with absolute specificity" the facts

7

underlying defendant's plea. The prosecutor agreed with defense counsel that the preliminary hearing transcript provided a fuller explanation of the factual basis for the plea.

In March 2019, defendant filed a pro. per. petition for resentencing under section 1170.95. The petition alleged that he pled guilty to first or second degree murder in lieu of going to trial because he believed he could have been convicted of first or second degree murder at trial pursuant to the felony murder rule or the natural and probable consequences doctrine; that he could not now be convicted of first or second degree murder because of changes made to sections 188 and 189, effective January 1, 2019; and that he was convicted of first degree felony murder and could not now be so convicted because of changes to section 189. The petition further alleged that he was not the actual killer; did not, with the intent to kill, aid, abet, counsel, command, induce, solicit, request, or assist the actual killer in committing first degree murder; he was not a major participant or did not act with reckless indifference to human life; and, the victim was not a peace officer. The petition also alleged that there had been a prior determination by a court or jury that he was not a major participant and/or did not act with reckless indifference to human life under section 190.2, subdivision (d). Defendant requested the appointment of counsel.

The prosecutor filed an opposition to the petition for resentencing, requesting that the court summarily deny the petition because defendant was the actual killer who proximately caused Black's death. They attached a probation officer's report which recounted a police report in the matter. The probation report contained a statement from defendant apologizing for the murder and admitting to participating in beating Black.

The court appointed defendant counsel, and defense counsel filed a reply brief, arguing defendant had made a sufficient prima facie showing under section 1170.95 to warrant an order to show cause and evidentiary hearing. In his view, the prosecutor's argument that he was the actual killer and a major participant who acted with reckless

8

indifference to human life based on the probation report was premature; such an argument was more appropriately made at a hearing after issuance of an order to show cause. The argument also was not supported by the preliminary hearing transcript, which the parties had stipulated to as the factual basis for the plea.

Defendant's reply brief further noted defendant had originally moved under section 995 to set aside the information, claiming there was no evidence of premeditation and deliberation and further arguing that the felony murder rule did not apply because while defendant was engaged in robbery, the killing was not done in furtherance of the robbery. The prosecutor had opposed the motion, arguing there was ample evidence of first degree murder " 'supplied on a felony-murder basis.' " The court, defendant's reply brief noted, denied defendant's section 995 motion, and he subsequently pled guilty to first degree murder per section 189.[6]

In June 2019, after considering defendant's petition, the parties' written briefs, and the court's own file, the trial court, without holding a hearing, issued a written order denying defendant's petition for resentencing. The court found defendant had failed to make a prima facie showing that he was entitled to relief under the statute because the transcripts for defendant's guilty plea and sentencing showed that he pled guilty to first degree murder only and that the felony murder allegations were dismissed in exchange for his plea. The court thus concluded that defendant was not convicted of felony murder or under a natural and probable consequences theory. Defendant timely appealed.

## II. DISCUSSION

Defendant contends the trial court erred by summarily denying his petition, even though he properly alleged a prima facie basis for relief, because there was a possibility

---

[6] We granted defendant's request to augment the record on appeal with defendant's section 995 motion, the People's response, defendant's reply, and the court's order denying the section 995 motion to set aside the information.

his conviction was premised on a felony murder theory and the court prematurely attempted to resolve disputed factual issues without an evidentiary hearing. He contends the court's error violated his federal due process rights.

The People concede the court erred in concluding that defendant was ineligible as a matter of law simply because he was convicted of first degree murder. But they argue that the ruling (although not the court's reasoning) was correct and should be affirmed because the record of conviction shows he was convicted of first degree murder as an actual killer. At this early stage in the section 1170.95 proceeding, we conclude defendant has the better argument.

Senate Bill No. 1437, which became effective on January 1, 2019, was enacted "to amend the felony murder rule and the natural and probable consequences doctrine, as it relates to murder, to ensure that murder liability is not imposed on a person who is not the actual killer, did not act with the intent to kill, or was not a major participant in the underlying felony who acted with reckless indifference to human life." (Stats. 2018, ch. 1015, § 1, subd. (f). Senate Bill No. 1437 also added section 1170.95, which allows those "convicted of felony murder or murder under a natural and probable consequences theory [to] file a petition with the court that sentenced the petitioner to have the petitioner's murder conviction vacated and to be resentenced on any remaining counts when all of the following conditions apply: [¶] (1) A complaint, information, or indictment was filed against the petitioner that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine. [¶] (2) The petitioner was convicted of first degree or second degree murder following a trial or accepted a plea offer in lieu of a trial at which the petitioner could be convicted of first degree or second degree murder. [¶] (3) The petitioner could not be convicted of first or second degree murder because of changes to [s]ection 188 or 189 made effective January 1, 2019." (§ 1170.95, subd. (a).)

10

Section 1170.95, subdivision (c) sets forth the procedure for considering a petition for resentencing. It provides: "The court shall review the petition and determine if the petitioner has made a prima facie showing that the petitioner falls within the provisions of this section. If the petitioner has requested counsel, the court shall appoint counsel to represent the petitioner. The prosecutor shall file and serve a response within 60 days of service of the petition and the petitioner may file and serve a reply within 30 days after the prosecutor response is served. These deadlines shall be extended for good cause. If the petitioner makes a prima facie showing that he or she is entitled to relief, the court shall issue an order to show cause."

Section 1170.95, subdivision (c) requires only a single prima facie showing and entitles the petitioner to the appointment of counsel upon the filing of a facially sufficient petition. (*People v. Lewis* (2021) 11 Cal.5th 952, 962 (*Lewis*).)[7] Once the court has appointed counsel and received briefing from the parties, it may rely on the record of conviction in determining whether that single prima facie showing has been made. (*Id.* at p. 970.) The record of conviction includes a prior appellate court opinion, although such an opinion may not supply all necessary answers. (*Id.* at p. 972.)

"While the trial court may look at the record of conviction after the appointment of counsel to determine whether a petitioner has made a prima facie case for section 1170.95 relief, the prima facie inquiry under subdivision (c) is limited." (*Lewis, supra*, 11 Cal.5th at p. 971.) "In reviewing any part of the record of conviction at this preliminary juncture, a trial court should not engage in 'factfinding involving the weighing of evidence or the exercise of discretion.' " (*Id.* at p. 972; *People v. Drayton* (2020) 47 Cal.App.5th 965, 980 (*Drayton*), abrogated on other grounds in *Lewis, supra,*

_____

[7] The parties originally agreed that there were two prima facie showings required under section 1170.95, subdivision (c), but the Supreme Court's decision in *Lewis* rejected that interpretation of the statute. (*Lewis, supra*, 11 Cal.5th at p. 962.)

at p. 962 [the "authority to make determinations without conducting an evidentiary hearing pursuant to section 1170.95, subd[ivision] (d) is limited to readily ascertainable facts from the record (such as the crime of conviction), rather than factfinding involving the weighing of evidence or the exercise of discretion (such as determining whether the petitioner showed reckless indifference to human life in the commission of the crime)"].)

"Like the analogous prima facie inquiry in habeas corpus proceedings, ' "the court takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved. If so, the court must issue an order to show cause." ' " (*Lewis, supra*, 11 Cal.5th at p. 971; see *Drayton, supra*, 47 Cal.App.5th at p. 978.) Once the trial court issues an order to show cause, it must then conduct a hearing pursuant to the procedures and burden of proof set out in section 1170.95, subdivision (d), unless the parties waive the hearing or the petitioner's entitlement to relief is established as a matter of law by the record. (§ 1170.95, subd. (d)(2); *Drayton, supra*, at pp. 980-981.)

Although a court should not reject a petitioner's factual allegations on credibility grounds without first conducting an evidentiary hearing (*Lewis, supra*, 11 Cal.5th at p. 971), the court need not credit factual assertions that are untrue as a matter of law. (*Drayton, supra*, 47 Cal.App.5th at p. 980.) Thus, " 'if the record, including the court's own documents, "contain[s] facts refuting the allegations made in the petition," then "the court is justified in making a credibility determination adverse to the petitioner." ' " (*Lewis, supra*, at p. 971; *Drayton, supra*, at p. 979.)

Here, defendant stated in his declaration that he pled guilty to first degree felony murder, which could no longer support a murder conviction after the changes to sections 188 and 189. He denied being the actual killer, aiding and abetting the actual killer with the intent to kill, or being a major participant who acted with reckless indifference to human life. The record of conviction does not disprove these statements as a matter of law. Rather, as defendant notes, he merely pled guilty to first degree murder under

12

section 187 with no specification as to any theory of liability after the prosecution had argued there was ample evidence of first degree felony murder, and the evidence conflicts regarding what role each of the participants played in Black's death. While it is certainly possible that defendant was convicted on a theory of liability that is still permissible under sections 188 and 189, the mere existence of that possibility does not make defendant ineligible for relief as a matter of law. The fact that evidence supports defendant's conviction on a valid theory does not mean the record conclusively establishes that defendant pled guilty based on that theory, nor does it establish that he did not plead guilty based on a now invalid theory. (*People v. Duchine* (2021) 60 Cal.App.5th 798, 814-815.) It was thus erroneous for the trial court to weigh the evidence and engage in fact finding to conclusively determine that defendant was convicted of first degree murder only without reliance on the felony murder rule. (*Drayton, supra*, 47 Cal.App.5th at p. 980.)

We reject the People's similar attempt to engage in premature fact finding based on the weighing of evidence when arguing defendant was the actual killer based on the prosecutor's generalized and abbreviated rendition of the facts during the plea hearing. As the prosecutor noted, his brief factual summary was an overview and was not intended to represent the facts with absolute specificity. Instead, counsel for both parties acknowledged that the preliminary hearing transcript better represented the factual basis for the plea. A review of the preliminary hearing transcript reveals conflicting evidence regarding the events leading up to and during Black's killing, which should not be weighed at this early stage of the section 1170.95 process. (*Lewis, supra*, 11 Cal.4th at p. 972.)

Construing the facts in favor of defendant, the petition fulfilled the requirements for relief in section 1170.95, subdivision (a), and the trial court should have issued an order to show cause for an evidentiary hearing. (*Drayton, supra*, 47 Cal.App.5th at pp. 982-983.) We will reverse the trial court's order denying the petition and remand

13

with directions to issue an order to show cause under section 1170.95, subdivision (c), and to hold a hearing under section 1170.95, subdivision (d). We express no opinion about whether defendant is entitled to relief following the hearing. Given our conclusion, we do not address defendant's constitutional due process argument. (*People v. Pantoja* (2004) 122 Cal.App.4th 1, 10 [principles of judicial self-restraint require courts to avoid deciding a case on constitutional grounds unless absolutely necessary; nonconstitutional grounds should be relied on if they are available].)

## III. DISPOSITION

The trial court's order denying the petition for resentencing is reversed. The case is remanded for the trial court to issue an order to show cause and hold a hearing to determine whether defendant is entitled to relief under section 1170.95.

/S/

_____

RENNER, J.

We concur:

/S/

_____

HULL, Acting P. J.

/S/

_____

KRAUSE, J.