Filed 9/25/23  P. v. Ruelas CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C096256 |
| Plaintiff and Respondent, | (Super. Ct. No. 21FE014556) |
| v. | |
| JOSE IGNACIO RUELAS, | |
| Defendant and Appellant. | |

A jury convicted defendant Jose Ignacio Ruelas of domestic violence (Pen. Code, § 273.5, subd. (a); statutory section citations that follow are found in the Penal Code unless otherwise stated), resisting arrest (§ 148, subd. (a)(1)), and child abuse (§ 273a, subd. (b)).  The trial court sentenced defendant to three years in state prison plus 1oneyear and 180 days in county jail.

On appeal, defendant contends the trial court erred in rejecting defendant's request for a jury instruction on self-defense.  We find no error because substantial evidence did

1

not support the instruction. Defendant also asserts that the court should have stayed the sentence on the child abuse conviction under section 654, arguing the domestic violence conviction involved the same conduct. Again we find no error, in this instance because defendant had multiple objectives and the two crimes had different victims.

We affirm the judgment.

## FACTS AND HISTORY OF THE PROCEEDINGS

Defendant and the victim had an off-and-on relationship for about four years. The victim already had two minor children, J. and M., and was pregnant with defendant's child.

On August 22, 2021, defendant was in the process of moving into the victim's apartment. That day the victim went to urgent care to get a doctor's note to return to work. Defendant showed up at urgent care and told the victim that she did not need to be there since she had a doctor's appointment scheduled for two days later. The victim left urgent care separately from defendant because she didn't want to be with him and wanted to calm herself. When she returned to the apartment a couple hours later, defendant had packed most of his belongings in his car. He told the victim he was leaving. She left to pick up her children who were with their grandparents. When the victim returned, defendant was gone from the apartment. He came back to get his remaining belongings but went to take a shower. While defendant was in the shower, the victim moved his belongings to the front door to show defendant she wanted him to leave.

The victim's puppy had urinated on the bed. She showed the puppy the spot on the bed and was taking it outside to show it to urinate outside. Defendant told her she was handling the situation wrong. The victim told him this was not his concern. Defendant responded in an aggressive tone that everything in the world concerned him. When the victim took the dog outside, defendant locked her out of the apartment.

2

Defendant said she was not acting right and needed to calm down. The victim tried to get back in the apartment, but defendant refused to let her in.

The victim walked to the back of the apartment to look in a window and check on the children in their bedroom. When she walked back around to the front, defendant had opened the door. The victim asked defendant why he would not leave. He said he would leave when he was ready and it was best for her just to be quiet. The victim did not want to argue and went to bed.

During the night, the victim woke to find defendant's hands around her neck. He had both hands around her neck for about 10 seconds. The victim was shaking and crying. Defendant let go and the victim cried herself to sleep. Defendant had put the victim in a choke hold three times before, each time telling her she was crazy and needed to calm down.

The next morning the victim was getting J. ready for school. J. was in the shower and the victim was making breakfast. When J. got out of the shower, the puppy ran into the bathroom and J. greeted it enthusiastically. Defendant got off the bed and went towards the bathroom; he seemed irritated. Defendant asked J. repeatedly why he talked to the dog like that. The victim followed defendant to the bathroom. Defendant was in the bathroom with J. and the door closed. The victim stood outside the bathroom door listening to defendant ask J. why he greeted the puppy that way. Defendant would not open the door for the victim. The victim pushed the door open. She heard defendant say he was being hit by the door. When the victim got the door open, she saw that J. looked uncomfortable. Defendant pushed the victim out of the bathroom and shut the door. The victim opened the door again. Defendant picked her up by the arms and moved her down the hallway.

The victim told J. to go to his room to finish getting ready for school. Defendant started to go toward J.'s room. The victim stood in front of J.'s bedroom door to keep defendant from entering. When the victim would not let him past, defendant picked the

3

victim up and threw her on the ground on her stomach and put his knee on her right shoulder blade. As defendant picked her up, the victim tried to hit him but was unable to. The victim grabbed at defendant's hair and wrapped her legs around his waist. Defendant took the sleeves of the victim's robe and wrapped them around her neck. J. came out of his bedroom and had to step over them to go into the kitchen. He was crying. M. was at the kitchen table watching everything. The victim was panicking. Defendant pulled on the sleeves making it harder for the victim to breathe. She tried to turn her head to breathe better but defendant put his elbow on her cheek.

J. kept crying while watching the victim and defendant on the floor. Defendant told J. he was restraining the victim because she was acting crazy. The victim asked J. to go to his friend's house in the apartment complex because she needed help. Defendant told J. there would be "consequences" if he went to get help. J. was shaking, uncertain what to do. Then he ran outside. Defendant let go of the victim and locked the front door. The victim unlocked the door and ran after J. The victim caught up with J. at his friend's house.

Katelyn B. the mother of J.'s friend, and her boyfriend Joseph D. heard pounding on the door. Joseph D. opened the door and saw J. crying and shaking and telling him that things were going wrong at his apartment. J. told Joseph D. that defendant and the victim were fighting, and J. and the victim had gotten locked out of the apartment. When the victim arrived, she was shaking and crying. The victim told Joseph D. that defendant had locked her out and would not let M. leave. Joseph D. followed her back to her apartment. Joseph D. spoke to defendant through a metal lattice security gate on the front door. Defendant told Joseph D. that the situation was none of his business. Defendant looked ready to fight. He threatened Joseph D., Katelyn B., and her children. The victim banged on the door, trying to get M. out. When Katelyn B. saw the victim begging defendant to let M. out, Katelyn B. called 911.

4

Jason Kimbrell, an officer with the Rancho Cordova Police Department, responded to a report of a domestic disturbance at an apartment complex. When he arrived, he saw the victim in a bathrobe outside an apartment. She was visibly distraught, crying, and rocking back and forth. She was initially reluctant to speak but eventually told the officer that she was trying to get M. out of the house. Kimbrell and his partner initially attempted to move towards the apartment to make contact with defendant, but the victim had said that defendant was hostile to law enforcement. After consulting with supervisors, law enforcement decided to set up a perimeter around the apartment.

Once officers were in position, an officer used a loudspeaker to request defendant to come out of the apartment. About an hour and half later, M. came out of the apartment.

By midday, the special enforcement detail (SED) had arrived and taken over the scene, evacuating the surrounding apartments. SED made announcements to defendant to come out of the apartment. After an hour, SED removed the security gate from the front door of the apartment. When defendant still would not come out, officers turned off the gas and then the water to the apartment. Officers tried to fly a drone into the apartment and threw in gas cannisters; defendant knocked down the drone and threw the cannisters back out. Defendant then appeared at the front door with a towel over his head and cloth over his mouth. When defendant looked like he was trying to find a way to escape, an officer fired two beanbag rounds into his abdomen. Defendant tried to run back in the apartment but slipped on water and soap he had doused the apartment with. Officers entered and took defendant into custody.

Laura Beebe, a forensic nurse with the Bridging Evidence Assessment and Resources clinic, testified as an expert in the area of forensic nursing and strangulation. Beebe examined the victim on August 24, 2021. Beebe performs strangulation examinations as part of a domestic violence examination. She observed abrasions on the right side of the victim's neck, left shoulder, and right arm. There were faint bruises on

5

both arms. There were no significant injuries to the victim's hands, indicating that she was unable to fight defendant. The victim's injuries were consistent with strangulation. The victim had no other signs of strangulation such as numbness, weakness, or difficulty breathing or swallowing.

David Cropp, a former detective sergeant, testified at trial as an expert witness on domestic violence. Cropp testified about the cycle of violence, in which there are three phases: a tension-building phase, an acute phase of physical but sometimes only emotional abuse, and a "honeymoon" phase where abusers are contrite and the victims can feel comfortable again. He also described the "power and control wheel," which refers to abusive tactics, including: minimizing, denying, or blaming the victim for abuse; manipulation; isolation; sometimes using children as conduits for abuse; coercion; economic abuse; and emotional abuse.

Cropp testified that abusers will "infect" children to make them believe the victim is the problem. Abusers will threaten to take the children, call child protective services, or blame the victim for problems raising the children. Research shows that exposure to domestic violence has a devastating effect on children. It affects their ability to "self-soothe" and leads them to become hypervigilant, disassociate, and shut down or become aggressive.

Cropp testified that victims of domestic violence may display counterintuitive behavior by returning to the abuser. The cycle of abuse may break when a child becomes involved, the victim has had enough, or after the victim seeks help and resources.

In 2018, the victim called police about a domestic dispute with defendant. She was living with defendant and he wanted her to move out. The victim wanted to take her puppy but defendant wanted to keep it. After loading her belongings in the car, the victim sat on the floor and said she would not leave without the puppy. Defendant dragged her by her hair about 12 feet. The victim did not press charges because, as she told police, defendant was a "nice guy."

6

As earlier set forth, defendant was charged with felony domestic violence (§ 273.5, subd. (a)), misdemeanor resisting arrest (§ 148, subd. (a)(1)), and misdemeanor child abuse (§ 273a, subd. (b)). A jury found defendant guilty of all charges. The trial court sentenced defendant to the middle term of three years in state prison for domestic violence, one year consecutive in county jail for resisting arrest, and an additional 180 days consecutive in county jail for child abuse of J.

Defendant filed a notice of appeal that we deemed timely filed under the constructive filing doctrine.

## DISCUSSION

### I

### *Self-defense Instruction*

Defendant contends the judgment should be reversed because the trial court prejudicially erred in denying defendant's request for an instruction on self-defense, which, defendant asserts, was supported by substantial evidence.

A trial court is required to instruct the jury on self-defense upon request if there is substantial evidence to support it. (*People v. Stitely* (2005) 35 Cal.4th 514, 551.) " ' "To justify an act of self-defense . . . , the defendant must have an honest *and reasonable* belief that bodily injury is about to be inflicted on him." ' [Citation.] In other words, the defendant's belief must both subjectively exist and be objectively reasonable. [Citation.] Additionally, '[t]he threat of bodily injury must be imminent' and the force used in response ' "reasonable under the circumstances." ' [Citation.]" (*People v. Brady* (2018) 22 Cal.App.5th 1008, 1014.)

In determining whether substantial evidence supports a self-defense instruction, the court does not decide the credibility of defendant's evidence, but only whether this evidence, if believed by the trier of fact, is sufficient to raise a reasonable doubt about defendant's guilt. (*People v. Salas* (2006) 37 Cal.4th 967, 982.) However, where the

7

evidence is minimal and insubstantial, the trial court need not give the instruction. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1145; *People v. Ramirez* (1990) 50 Cal.3d 1158, 1180.) We review the trial court's refusal to give a self-defense instruction de novo. (*People v. Simon* (2016) 1 Cal.5th 98, 133.)

At trial, defense counsel argued there was sufficient evidence for a self-defense instruction, because "there are numerous instances of [the victim] admitting to trying to hit the defendant or hitting the defendant or hitting him with the door or various acts of aggression on her part." The prosecutor responded that the " 'aggressiveness,' " as the defense named it, "was in response to something the defendant did first."

The trial court declined to instruct the jury on self-defense, explaining that even if the victim were the aggressor, such as by hitting defendant with the bathroom door, there was no evidence that defendant believed he was in imminent danger of bodily injury and needed to use force to defend himself. The fact that the victim opened the door to the bathroom and hit defendant did not support that belief.

Defendant did not testify so there was no direct evidence of his state of mind, i.e., that he acted in self-defense when he threw the victim on the ground and began to strangle her with the sleeves of her bathrobe. Testimony that the victim pushed open the bathroom door to get to J. inside with defendant and hit defendant in the process did not supply that evidence.

Moreover, self-defense is limited to the use of force that is reasonable under the circumstances. (*People v. Minifie* (1996) 13 Cal.4th 1055, 1065.) Defendant threw the victim on the ground and planted his knee on her back when she blocked the door to J.'s bedroom. No juror would find this to be a reasonable use of force under the circumstances. Lastly, any attempt the victim made to intentionally hit defendant occurred while he was picking her up to throw her on the floor. (*People v. Enraca* (2012) 53 Cal.4th 735, 761 [one who initiates an attack may not claim self-defense when a victim justifiably fights back].)

We conclude the trial court was not required to instruct the jury on self-defense.

## II

*Section 654*

Defendant next contends that the trial court erred in not staying the sentence imposed for child abuse under section 654, because his conviction for this offense was based on the same act as his conviction for domestic violence.

At the sentencing hearing, defense counsel requested that, if defendant was not granted probation, the trial court impose the lower term for felony domestic violence and concurrent sentences for misdemeanor resisting arrest and misdemeanor child abuse. The prosecutor argued for the middle term for domestic violence but did not address the misdemeanors.

The trial court imposed the middle term sentence of three years for domestic violence, one year for resisting arrest, and 180 days for child abuse of J. The court stated that it had considered the application of section 654 to the domestic violence and child abuse convictions, but concluded that the statute did not apply because the defendant had multiple, separate objectives, which were independent and not incidental to each other. The court ruled that the misdemeanor sentences would run consecutive to each other, as well as to the sentence for domestic violence.

Section 654, subdivision (a) provides: "An act or omission that is punishable in different ways by different provisions of law may be punished under either of such provisions, but in no case shall the act or omission be punished under more than one provision." Section 654 does not permit multiple punishments for a single act or for multiple acts constituting an indivisible course of action, even though that act violates more than one statute or constitutes more than one crime. (*People v. Hutchins* (2001) 90 Cal.App.4th 1308, 1312.) " 'Whether *a course of criminal conduct* is divisible and therefore gives rise to more than one act withing the meaning of section 654 depends on

9

the *intent and objective* of the actor.  If all of the offenses were incident to one objective, the defendant may be punished for any one of such offenses but not for more than one.' " (*People v. Rodriguez* (2009) 47 Cal.4th 501, 507.)  "The question whether section 654 is factually applicable to a given series of offenses is for the trial court, and the law gives the trial court broad latitude in making this determination.  Its findings on this question must be upheld on appeal if there is any substantial evidence to support them." (*Hutchins,* at p. 1312.)

Substantial evidence supports the trial court's findings that defendant had separate objectives.  The court could reasonably conclude that defendant's objective in throwing the victim to the floor and strangling her was to physically dominate her and inflict pain for blocking him from reaching J.  Defendant's own statements showed that he had different objectives with respect to J. when defendant was choking the victim.  Defendant attempted to persuade J. that the victim was to blame when defendant said he was restraining her because she was acting crazy.  Failing that, defendant attempted to intimidate J. when defendant said that there would be consequences if J. left to get help.

More significant, however, is the fact that defendant's actions harmed two people, the victim and J. as testified to by the prosecution's expert witness, David Cropp.  Section 654 does not apply to multiple victims of a single violent act.  (*People v. Pantoja* (2004) 122 Cal.App.4th 1, 15-16 (*Pantoja*); see also *People v. Burton* (2007) 143 Cal.App.4th 447, 456; *People v. Martin* (2005) 133 Cal.App.4th 776, 782-783.)

In *Pantoja,* the court held that the defendant could be separately punished for murder and child abuse where he killed his girlfriend in their daughter's presence. (*Pantoja, supra*, 122 Cal.App.4th at pp. 15-16.)  The defendant contended that both his conviction for murder and child abuse resulted from the single act of causing the death of his girlfriend.  (*Id.* at p. 15.)  The defendant argued the multiple victims exception did not apply because child endangerment was not a crime of violence because his violent acts were not directed at his daughter.  (*Id.* at p. 16.)  The court explained that a violent act

10

that harms more than one person may be punished separately for each person. (*Ibid.*) The court concluded there was no requirement that the defendant intended to harm each victim. (*Ibid.;* see also *People v. Solis* (2001) 90 Cal.App.4th 1002, 1024 ["psychic violence" constitutes violence for purposes of the multiple-victims exception].)

Here, defendant's conviction for felony child abuse necessarily required the jury to conclude that he committed an act of violence—throwing the victim to the ground and strangling her—by means likely to cause harm to J. Indeed, the evidence is that J. was harmed. He was crying and shaking as he watched defendant strangle his mother and she pleaded with him to get help. Therefore, defendant harmed two people by his violent act and may be punished separately for the two offenses.

We conclude the trial court did not err in imposing a consecutive sentence for child abuse.

DISPOSITION

The judgment is affirmed.

_____
HULL, J.

We concur:

_____
EARL, P. J.

_____
RENNER, J.

11